[No. 33060. *En Banc.* December 1, 1955.]

THE STATE OF WASHINGTON, *Respondent*, v. ARTELL JUNIOR FARLEY, *Appellant*.[1]

[1] Reported in 290 P. (2d) 987.

*Felix & Abel*, for appellant.

*John J. O'Connell, Frederick R. Hokanson, Thomas R. Garlington,* and *J. Houston Vanzant, Jr.*, for respondent.

MALLERY, J.—Appellant, Artell Junior Farley, was charged with the first degree murder of Mrs. Flora McFarland committed on February 21, 1954, in the city of Tacoma. Upon the trial, the jury returned a verdict of guilty, and answered "yes" to the interrogatory "Shall the death penalty be inflicted?"

The corpse of the victim was found in the forenoon of February 22, 1954, floating in a pool of water in the Harrison gravel pit. She died from multiple wounds, not from drowning. The scene of the crime showed evidence of a violent murder. A description of the body and the scene would not aid in discussing the legal questions presented on appeal.

During the night of February 21, 1954, appellant hid his bloody suit under his mother's porch and fled south in the victim's automobile. He left a note for his mother in which

he stated that Flora was dead, that he was sorry, but that she deserved it. On February 23, 1954, he wired his mother for money from Roseburg, Oregon, but, before it arrived, he was apprehended by officers who spotted the victim's car from a description sent out on a police radio dispatch.

Appellant told the Roseburg officers that Flora McFarland (with whom he had been going steadily for about a year) had lied as to her whereabouts on Saturday night, when she had broken a date with him. That he had gotten up late Sunday, had drunk several beers, and had told his mother he was mad at Flora, because she had "stood him up" the night before. He said that, at about four o'clock, he had taken a bus to the apartment of Flora and her friend, Donna Miller, with whom she lived, and that after dinner Flora had stated that she was going to take him home and return immediately. That they had gotten into her car and he had asked her to drive to the gravel pit, where she had parked in front of a bunker. They had started arguing about Saturday night, and she said she had been home, but the fellows who had been at the apartment that afternoon had talked about her being at "Rocky's." He said he knew she had been lying, and that he must have killed her.

A hunting knife, with human blood on it, was found on the rear gravel shield of the victim's car. A doctor testified that it could have caused some of the injuries to the hands and head of the victim.

The victim's friend, Donna Miller, testified that the Saturday night before the murder, appellant was to have met Flora at the store where she worked, but since he did not appear, she and Flora went out to Monta Vista to see about their car and Flora stopped in at Rocky's Tambourine for a few minutes; that appellant came to their apartment Sunday afternoon and immediately asked Flora where she had been the night before; that they then went into the kitchen and she could not hear what was said, but that it sounded like an argument. That appellant had dinner and that several men friends called while he was there.

Appellant's trial counsel made it clear, during the *voir*

*dire* examination of jurors, that there would be no "real dispute" that appellant had killed Flora McFarland. Appellant's objective throughout the trial was to escape the death penalty. He did not take the stand in his own behalf.

Appellant's counsel upon the appeal (who did not try the case) contend appellant should have a new trial, because of the prejudicial errors committed. It took two-and-one-half days to empanel the jury. Appellant's trial counsel adopted the strategy of attributing the crime to jealousy, and zealously attempted to discover a predisposition in the prospective jurors to exercise leniency on that account. These efforts were countered by the prosecutor's equally zealous attempt to discover an opposite predisposition among the prospective jurors.

It is the position of appellant's appeal counsel that the prosecutor's examination constituted prejudicial error. Timely objections were not made to the examination in question. Defense trial counsel were obviously in no position to object, because their own examination invited the prosecutor to make similar inquiries of the jurors. Appellant's trial counsel did not exhaust their peremptory challenges and did not challenge the panel.

Nevertheless, appellant's appeal counsel contend that there was a burden upon the trial court, even in the absence of objections, to restrict the examination of jurors to its proper limits. We have repeatedly said that the burden of preventing trial errors rests squarely upon counsel for both sides. Counsel must state the reason why the court is in error in time to enable the court to correct it. A party cannot secrete an error for use upon appeal in case the verdict goes against him. See *State v. Tharp*, 42 Wn. (2d) 494, 256 P. (2d) 482.

Appellant's appeal counsel contend that the trial court erred when it allowed the state to reopen its *voir dire* examination of prospective jurors a number of times over objections. The record shows that both sides reopened their examination as often as they liked. The trial court impartially exercised its discretion in this regard. In each

instance, when the state reopened, the trial court afterwards asked the defense counsel if they desired to examine the juror any further. The trial court's discretion was exercised well within its power, which is very wide on such matters. *State v. Hunter*, 183 Wash. 143, 48 P. (2d) 262; *State v. Tharp, supra.*

■ Appellant's appeal counsel contend the state injected the appellant's character in issue when the prosecutor asked a prospective juror:

"Have you any information, so called, that came to you by reputation or other discussion in regard to the character of the defendant?"

Appellant's trial counsel did not object to the question. In any event, it was intended to test the pretrial knowledge of the juror about the case. The juror denied any information on the subject. There is no inference to be drawn from the prosecutor's question that the character of the appellant would be put in issue during the trial.

■ Appellant's appeal counsel make the same contention with regard to the prosecutor's question:

"Would the fact, Mr. Parker, that the defendant or the deceased did things not necessarily in relation to this crime of which you would not socially approve, would you allow that to prejudice yourself, either in favor of the defendant or against him?"

The question was not intended to put the appellant's character in issue, and did not do so. It was an attempt to discover a predisposition in the prospective juror to react in a certain way to a certain situation. The appellant's trial counsel were probing for the same predisposition in their question:

"Now, as that evidence is presented here it probably will be rather revolting to you and completely contrary to your own concepts of living, but will you wait, before forming any opinion whatsoever, until you have heard both sides of the case?"

■ Appellant's appeal counsel contend that it was misconduct and prejudicial error for the prosecutor to say in his opening statement:

"Shown also in evidence for the State will be certain instances that occurred in the lives of these two people prior to the killing, which show previous acts of violence on the part of the defendant towards Flora McFarland. . . . one of these times of prior act of violence—."

The trial court sustained an objection to the remainder of the intended statement. Such a statement is not prejudicial error if the prosecutor, in good faith, thought he would be able to introduce the evidence related. *State v. Lyskoski*, 47 Wn. (2d) 102, 287 P. (2d) 114. The prosecutor made an effort, in the trial, to introduce the evidence in question. His good faith was assumed by both court and counsel. The burden of showing bad faith is upon the appellant. *State v. Weekly*, 41 Wn. (2d) 727, 252 P. (2d) 246. The statement was not prejudicial error.

The appellant assigns as error:

"The orders of the trial court overruling defendant's objections to the prosecuting attorney's questioning of the State's witness, Thomas J. McCallum, as to why McCallum went to the apartment where the deceased resided with her girl friend, Donna Miller."

In relation to this assignment, the record shows that the following occurred:

"Q. Previous to going to the house, or to the apartment that you referred to, had you received any telephone calls? Mr. HAGER: If the Court please, we are going to object to that. We can assume that he has prior to that time received many telephone calls, unless —. THE COURT: Objection will be overruled. Q. Had you received any telephone calls? A. Yes. Q. From whom? —if you know. A. (Pause.) Q. From whom? A. Let's see—I don't know how to put it. From Mr. Farley's mother. Q. From Mr. Farley's mother. Approximately what time of the day was that? A. Oh, approximately—oh, about quarter to six. Q. Why, Mr. McCallum, did you go to the apartment at 45th and South 'M'? Mr. HAGER: If the Court please, we are going to object to that on the basis that it's immaterial here—to this particular case. THE COURT: Well, I don't know. MR. HAGER: That he is, by an indirect question, attempting to get in information which he could not with a direct question, if the Court please. THE COURT: I think not; objection will be overruled.

Q. Why did you go to this apartment where you say you saw Spud and Flo? THE COURT: I don't want any conversations with anybody else. MR. HAGER: Pardon, your Honor? THE COURT: I have just cautioned the witness not to testify as to any conversation with anybody else. He can testify at whose direction or request he may have gone, but—. Q. Do you understand that? Maybe I should rephrase the question. At whose direction, if anyone's did you go to the apartment house where you say you saw Spud and his girl friend? A. Mrs. Farley. Q. Is that her correct name? Is that the name she uses now? A. I'm not sure. I know her by Mrs. Farley. Q. And you refer—you use that as the mother of the defendant? A. That's right. Q. Now, what did you do, Mr. McCallum, at the apartment? A. I went up to the apartment to see them; and that was it."

It is appellant's contention that the question, "Why, Mr. McCallum, did you go to the apartment at 45th and South 'M',", called for a hearsay answer, and that the jury would draw an inference from it that the conduct of appellant, or his statements, caused his mother to fear what he might do to Mrs. McFarland.

When the witness was asked why he went to Mrs. McFarland's apartment, counsel's objection was that it was immaterial, and when the trial court said, "Well, I don't know," counsel added, "That he is, by an indirect question, attempting to get information which he could not with a direct question." This objection was properly overruled.

The appellant's present contention is that the objection, as it was made, apprised the trial court that the question called for hearsay evidence. It obviously did not. Accordingly, counsel cannot urge a hearsay objection for the first time upon appeal. *Bolster v. Stocks*, 13 Wash. 460, 43 P. (2d) 532, 534, 1099; *Mosler v. Woodell*, 189 Wash. 583, 66 P. (2d) 353; *State v. Sparr*, 39 Wn. (2d) 576, 237 P. (2d) 194; *State v. Roby*, 43 Wn. (2d) 652, 263 P. (2d) 273.

The appellant contends the trial court erred in relation to the following occurrence:

"THE COURT: You may proceed, Mr. O'Connell. Q. Mr. Standish, I believe my question was: On the afternoon of, or during the day of February the 21st, 1954, did you receive any phone calls from either the defendant or the de-

fendant's mother? A. Yes, I did. Q. From whom did you receive a call? A. Mrs. Jackson. Q. At approximately what time? A. Oh, sometime in the afternoon— around 3:30. Q. Did you do anything as a result of that phone call? A. No. MR. COCHRAN: Now, if your Honor please, I object to that. He is trying to get indirectly what he is not permitted to get directly. THE COURT: He has already answered; he said he did nothing."

We find no reversible error in this incident. See *State v. Slater*, 36 Wn. (2d) 357, 218 P. (2d) 329.

The appellant assigns as error the admission in evidence of certain photographs of the victim and articles of her clothing. The contention is made that:

"Pictures of a nude and particularly beaten body are quite obviously morbidly inflammatory. A picture is only proof of what it shows. To be admissible, what is depicted must be an *issue* in the case. Otherwise it cannot be probative—only prejudicial. These pictures could prove nothing—they could only satisfy the morbidly curious and arouse resentment against *any* accused."

In a criminal case, a plea of not guilty puts all of the elements of the crime in issue, and the state must prove them beyond a reasonable doubt. *State v. Davis*, 6 Wn. (2d) 696, 108 P. (2d) 641. In putting in its case, the state cannot anticipate that the defense will admit anything. The defense can wait to elect what elements of the crime it will contest until after the state rests. An election to concede some element of the crime does not affect the admissibility of evidence and exhibits previously admitted in the state's case.

Pictures that accurately represent the true state or condition of the thing depicted, are admissible if they have probative value upon some element of the crime charged. The pictures and clothes in question had a probative value upon the questions of the identity of the victim, the means by which she came to her death, and the existence of intent on the part of appellant. Competent evidence is not prejudicial just because it is gruesome. See *State v. Drummond*, 70 Wash. 260, 126 Pac. 541; *State v. Payne*, 25 Wn.

(2d) 407, 171 P. (2d) 227, 175 P. (2d) 494; *State v. Nyland*, 47 Wn. (2d) 240, 287 P. (2d) 345.

Appellant's appeal counsel contend that the trial court erred in its refusal to instruct the jury on the law of manslaughter. We find no merit in this assignment. There is no evidence that the killing in question was unintentional or "without design to effect the death" of the victim. An instruction on manslaughter should not be given unless there is evidence in the case upon which a verdict of manslaughter can be predicated. *State v. Cook*, 126 Wash. 81, 217 Pac. 42; *State v. Cooley*, 165 Wash. 638, 5 P. (2d) 1005; *State v. Hiatt*, 187 Wash. 226, 60 P. (2d) 71; *State v. Hartley*, 25 Wn. (2d) 211, 170 P. (2d) 333.

The question involved in the concluding assignment of error was:

"Doctor, would you state whether or not you formed an opinion as to whether or not *the specific reaction at the time of the killing* was or was not an outbreak of rage and destructive hostility under severe stress?" (Italics ours.)

It appears from the record that the doctor, whose qualifications are admitted, had examined appellant on three occasions while he was in custody, and had seen the reports of two other doctors' examinations of appellant.

The purpose of the question here involved was not to elicit a diagnosis of appellant's mental condition as revealed by the examinations. Counsel was trying to rebut the inference of premeditation and intent, which could be drawn from the circumstances of the killing, by having the doctor testify as to a fact with regard to specific mental reaction of appellant at the time he committed the crime. Since the doctor was not present at the murder, he had no testimonial knowledge of appellant's appearance, statements, acts, and demeanor, or the circumstances surrounding the crime. His diagnosis of appellant's state of mental health, as revealed by subsequent examinations, cannot be related to the particular instant of the crime. Nevertheless, counsel contend that, if a layman can express an opinion as to the mental condition of a defendant at the time of com-

mitting a crime, there is even more reason for permitting a doctor to do so. This contention misconceives the Washington rule. In *State v. Gaul*, 88 Wash. 295, 152 Pac. 1029, with regard to a layman's testimony, we said:

"The intent with which an act is done is a mental process, and as such generally remains hidden within the mind where it is conceived, and is rarely, if ever, susceptible of proof by direct evidence, but may be inferred or gathered from the outward manifestations, by the words or acts of the person entertaining it, and the facts or circumstances surrounding or attendant upon the offense with which he is charged."

Accordingly, a layman *who sees the commission of a crime* can describe the acts, the appearance, and demeanor of a defendant, from which inferences as to a defendant's mental processes may be drawn, but a doctor who was not present at a crime has no testimonial knowledge of the circumstances needed to support such inferences. In *State v. Davis*, 6 Wn. (2d) 696, 108 P. (2d) 641, we said:

"The witness [Dr. Rickles], of course, had no personal knowledge concerning the facts of the case, and his opinion on the question of premeditation or the lack of premeditation was inadmissible."

The trial court's ruling was correct.
The judgment is affirmed.

ALL CONCUR.

---

April 4, 1956. Petition for rehearing denied.