**B. J. DICKEY, Appellant (Defendant below),**

v.

**STATE of Wyoming, Appellee
(Plaintiff below).**

No. 3613.

Supreme Court of Wyoming.

Aug. 20, 1968.

Thomas J. Fagan, James E. Sinon, of Fagan, Fagan & Sinon, Casper, for appellant.

James E. Barrett, Atty. Gen., Lynn R. Garrett, Deputy Atty. Gen., Cheyenne, for appellee.

Before HARNSBERGER, C. J., and GRAY, McINTYRE, and PARKER, JJ.

Mr. Justice McINTYRE delivered the opinion of the court.

B. J. Dickey was charged, tried and convicted of first degree murder in connection with the death of Grace MacManus. The jury specified the penalty should be without capital punishment and Dickey was sentenced to life imprisonment. His appeal assigns nine alleged errors in his trial.

### 1. *Sufficiency of Evidence*

█ Appellant's argument that the jury's verdict was not sustained by sufficient evidence is based upon the jury's failure to accept all of Dickey's testimony as to how Mrs. MacManus met her death. The defendant was the only eyewitness to the killing. His defense was that he accidentally killed decedent. Counsel argues that since defendant's credibility was not impeached and his testimony was not improbable and not inconsistent with facts shown, the jury was bound to accept his testimony and find for him on his defense of accidental killing. Eagan v. State, 58 Wyo. 167, 128 P.2d 215, 226, is cited as authority for this contention.

The defect in appellant's argument is twofold: (1) His credibility was impeached and put in doubt by the evidence; and (2) the testimony of defendant was contradicted by evidence on behalf of the State, which the jury had a right to believe.

During trial the defendant admitted the story offered by him at trial was not the story he had given to law enforcement officers while they were investigating the death of Grace MacManus and that he had "lied" to the investigating officers. Also, there was considerable evidence establishing facts which Dickey had consistently denied during the investigation of decedent's death, until confronted with irrefutable proof that such facts were true. Additionally, defendant admitted on the witness stand he at one time fabricated a kidnap story at Williston, North Dakota, by telling the F. B. I. he had been kidnapped, when in fact he had not. Dickey also was compelled to admit he sometimes falsified company expense accounts by listing persons supposedly taken to lunch, when he had not taken such persons to lunch.

Dickey related in his testimony that he had taken Mrs. MacManus to a secluded spot and had made advances toward her after which she suggested she might tell

Dickey's wife and might call the police. The situation became such, according to Dickey, that Mrs. MacManus left the car and started walking in a snowstorm, leaving her coat in Dickey's car. Defendant claims he started after her; that visibility was impaired by the snowstorm; and that he accidentally struck and killed her with his automobile.

Dickey's testimony was that he put the body in the trunk of his car and drove around not knowing what to do; that he stopped at a filling station and had his car and a three-gallon can filled with gas; and that thereafter the body was taken into the country and burned with the gasoline from the can. The station attendant testified a lady was lying in the back seat of Dickey's car and that he saw scratches on her face, from which blood was oozing, and saw her breathe.

Aside from the conflict as to whether Mrs. MacManus, while Dickey was at the filling station, was dead and in the trunk or breathing and on the back seat, there were other conflicts in the evidence. For example, the attendant said Dickey asked for used oil and Dickey denied that. The attendant and another witness testified Dickey came into the station from the west, while defendant insisted he came from the east. Also, hair found on the back seat of defendant's car was shown to match the hair of decedent, and this tended to contradict defendant's story which indicated decedent was never in the back seat.

Concerning the possibility of Dickey's wife hearing about his involvement, Dickey stated, "this was the least thing that I wanted to happen." He also described how he had taken his companion by the wrists and said, "We'll set here all night until you tell me you're not going to involve my wife in this." As we read defendant's testimony, we can understand the jury may have believed he was considerably disturbed by the possibility of Mrs. MacManus telling his wife.

When we consider this situation, along with his actions in not taking Mrs. Mac-Manus for medical examination and attention; his actions in burning her body; the fact that he supposedly was driving after Mrs. MacManus in a blinding snowstorm with knowledge she was ahead of him; and the extent of injuries inflicted upon decedent, we are compelled to say we do not consider his story so probable and likely that the jury could not disbelieve the part about the killing being accidental.

Medical testimony indicated decedent's body showed both collar bones were broken; the left arm bone was completely fractured below the shoulder joint; at least 13 ribs were severely fractured, with pieces broken off; both lungs were collapsed; and a femur bone was broken into a number of pieces, indicating it had been broken by a great deal of force. One of the doctors also explained that it would have taken a great deal of force to have broken the ribs as they were broken.

Dickey himself claims when his car was brought to a stop, decedent was lying behind the car. Even if the jury accepted defendant's story that Mrs. MacManus was run down by Dickey's automobile, there was ample evidence for it to believe the running down was deliberate and intentional.

### 2. *Conduct of Counsel*

Appellant claims certain conduct on the part of counsel for the State was improper and prejudicial. One such claim is that terms were used in the prosecution's opening statement which were not supported or justified by evidence in the case. The terms mentioned are "inflicted serious injuries," "disgusting beyond belief," "inflicted more injuries either with a club or with a car," "for the purpose of putting her to death by flame," and "burning to conceal something more horrible than the fire."

Inasmuch as defendant did not object at the time of trial to the prosecution's use of these terms, or ask the trial judge to instruct the jury concerning them, we need not consider the objection which is made for the first time on appeal. State v. Spears, 76 Wyo. 82, 300 P.2d 551, 562; Valerio v. State, Wyo., 429 P.2d 317, 319.

■ We will add the comment, however, that we have carefully reviewed each expression complained of in the light of the actual evidence in the case, and it is our opinion such expressions were sufficiently supported by evidence and were not prejudicial. In any event, appellant has failed to show any of the terms questioned were used in bad faith, and prejudicial error in the area claimed will not be assumed in the absence of a showing of bad faith on the part of the prosecuting attorney. Johnson v. State, 29 Wyo. 121, 211 P. 484, 487; State v. Farley, 48 Wash.2d 11, 290 P.2d 987, 990, certiorari denied 352 U.S. 858, 77 S.Ct. 79, 1 L.Ed.2d 65. As stated in the *Farley* case, the burden of showing bad faith is upon the appellant.

Another claim of misconduct is that the State, in its summation, argued on a Wyoming statute regarding the duty of a motorist to render aid, when no instruction had been given on the statute. Without referring to any particular law or statute, attorney for the State argued all of us know the driver of a vehicle involved in an accident resulting in injury to any person "is required" to render that person aid.

The record reveals counsel for defendant afterwards objected to this statement on the part of the prosecution. Whereupon the judge, speaking of the statement, told the jury it had been instructed as to the applicable law in the case by the court; that any reference by counsel to any other law had no bearing upon the issues to be decided; and that the jury would, therefore, disregard entirely the prosecuting attorney's reference to driver's responsibility. Defendant's attorney then remarked, "Thank you, Your Honor."

■ Thus, it is apparent from the record that counsel at the time of trial was satisfied with the correction made. He indicated no further objection and asked for no further correction. He apparently was willing for the matter to go to the jury with the correction which the court made; and he cannot be heard to complain afterwards, if and when the verdict turns out not to be to his liking. Webber v. Farmer, Wyo., 410 P.2d 807, 809–810.

The next question raised concerning conduct of counsel is that the State's attorney referred to a knife which was not introduced in evidence and commented upon testimony suggesting knife wounds, which the court had ruled inadmissible.

■ Articles found with decedent's body, including a knife which defendant admitted was his, were shown to the jury, and testimony concerning the knife was given. Where there is testimony concerning an article such as a knife, we know of no rule which would prohibit an attorney from referring to such article, whether it is actually offered in evidence or not. No argument or citation on behalf of appellant supports the proposition that a mere reference to the knife by the State's attorney was improper. We will not say it was.

As to whether counsel for the prosecution commented upon testimony suggesting knife wounds, which the court had ruled inadmissible, the record does not support appellant's contention. The State sought to have a police officer give an expert opinion as to what he saw in a photograph. He referred to a mark on decedent's body and said it "appears and has all the characteristics of a knife cut." On objection of the defense, the answer was stricken, and the jury was instructed to disregard it.

The record indicates the prosecuting attorney thereafter accepted the court's ruling and asked the witness only to describe what he saw, "without telling what your opinions are as to it." The witness answered: "I see a line approximately—I see a line across here, has a straight, tapered edge." The word "knife" was not mentioned after the court first excluded the witness' opinion, nor was the word "wounds." The marks were called to the attention of the jury for its consideration. This was proper and in keeping with the court's ruling.

Appellant further complains of argument made by the prosecuting attorney when he referred to the Nuremberg trials which

had to do with burning cases, it being appellant's contention that this was a discussion of penalties and it was improper for the prosecution to comment upon penalties. The only authority cited by appellant states, where the law imposes upon the jury the duty of determining the penalty, it is entirely proper for counsel to discuss the question of punishment.

■ Apparently appellant overlooks the fact that the prosecution was asking for the death penalty in this case, and when a verdict of first degree murder is returned, the jury has the duty of deciding whether the penalty shall be death or life imprisonment. Thus, it was proper for the prosecution to comment on the matter of punishment.

But, regardless of whether comments of the prosecution at this point were proper or improper, the defense made no objection. For reasons which we have heretofore set forth, we need not consider the objection made for the first time on appeal.

Another objection made for the first time on appeal, with no objection having been made during the trial, is that defendant was prejudiced because the prosecuting attorney challenged the fact that the defense attorney had said he was absolutely sure his client was innocent. The prosecuting attorney said this was not evidence and not proper argument. He continued by saying he was equally sure defendant was guilty and that is not evidence and should not be before the jury either.

■ Aside from the lack of timely objection, we fail to see how this argument could have been prejudicial. In any event, the prosecution's opinion as to the guilt of defendant was invited when defense counsel voiced his personal opinion as to the innocence of defendant, and the retaliation was of such a nature that it cannot be called prejudicial error. See United States v. DeVasto, 2 Cir., 52 F.2d 26, 30, 78 A.L.R. 336, certiorari denied 284 U.S. 678, 52 S.Ct. 138, 76 L.Ed. 573; People v. Izzo, 14 Ill.2d 203, 151 N.E.2d 329, 336, 89 A.L.R.2d 187, dismissed 362 U.S. 403, 80 S.Ct. 812, 4 L.Ed.

2d 864; and Annotation 99 A.L.R.2d 508, 552–560.

In appellant's brief, there is listed, as a separate complaint pertaining to conduct of counsel for the State, that such counsel deliberately led a police officer into making statements regarding apparent knife wounds, which was prejudicial to defendant. There is nothing new or different in this complaint which we have not already discussed in our previous consideration of the claim that counsel for the prosecution had improperly commented upon testimony suggesting knife wounds. No additional discussion of the subject is necessary.

### 3. *Admission of Photographs*

Appellant claims the trial court erred by admitting into evidence photographs which were merely enlargements of other photographs already received in evidence. The claim is that the enlargements had no probative value and were introduced for the sole effect of emphasizing the gruesome condition of decedent's body. It is also claimed that some of these photographs were received for specific purposes but were used by the State for other purposes.

■ Our court has said a trial court unquestionably has a reasonable discretion which it may exercise in determining whether exhibits such as photographs are unnecessarily gruesome and inflammatory and, unless this prerogative is manifestly abused, the supreme court will not interfere with the trial court's decision. State v. Callaway, 72 Wyo. 509, 267 P.2d 970, 972; State v. Lindsay, 77 Wyo. 410, 317 P.2d 506, 509–510.

■ Appellant's complaint with respect to enlarged photographs seems to relate primarily to State's Exhibit 9 and State's Exhibit 10. Upon objection by the defense, the court excluded these exhibits when offered for no special purpose. Afterwards Exhibit 10 was re-offered and received "so that the witness can point out to the jury certain items." Likewise, Exhibit 9 was re-offered and received for the pur-

pose of "not illustrating the body, but illustrating the area behind the body."

Witnesses actually did point out details which were discernible from the enlargements. In particular, details to be found in these exhibits were pointed out as the pathologist explained his findings.

State's Exhibits 12 and 17 are complained of by appellant. They were enlargements but apparently not enlargements of other photographs in evidence. Exhibit 12 was received "for the purpose of showing heat and generally a consumed body by flame." A witness pointed out from it the burned condition of the body. Several witnesses pointed out matters indicated in Exhibit 17.

As near as we can tell, it appears the trial judge exercised sound judicial discretion with respect to the photographs in question. Appellant has not shown the trial judge's prerogative in determining whether the exhibits were unnecessarily gruesome and inflammatory was manifestly abused. Although Dickey's counsel asserts emphatically that these photographs had no probative value and were intended to inflame the passion of the jury, it is apparent there was a probative value; and it would be mere speculation to say the intention of the prosecution in offering the exhibits was to inflame the passion of the jury.

What was said in State v. Alexander, 78 Wyo. 324, 324 P.2d 831, 837, certiorari denied 363 U.S. 850, 80 S.Ct. 1630, 4 L.Ed. 2d 1733, where a similar error was assigned, is applicable in the case now before us. We repeat and adopt the language there used:

> " * * * While some of these graphic depictions are not pleasant to look upon, and, in fact, are somewhat gruesome, we cannot say that they were not proper and necessary to be placed before the jury in order that they be enabled to get a proper perspective and an understanding of the testimonies that were given in connection with them. * * * "

For similar pronouncements which have been made in this jurisdiction, see State v. Kump, 76 Wyo. 273, 301 P.2d 808, 815; State v. Riggle, 76 Wyo. 1, 298 P.2d 349, 361, rehearing denied 300 P.2d 567, certiorari denied 352 U.S. 981, 77 S.Ct. 384, 1 L. Ed.2d 366; and State v. Lantzer, 55 Wyo. 230, 99 P.2d 73, 77–78.

As to whether exhibits introduced for specific purposes were used for other purposes, appellant fails to show us any substantial or prejudicial departure—at least none where he objected during trial and afforded the trial court an opportunity to act. We will not, therefore, go into that matter.

### 4. Search and Seizure

Appellant-Dickey contends the court erred in admitting into evidence items taken from the defendant by unlawful search and seizure. We have read and reread appellant's brief in order to find out what items he claims were admitted into evidence, which had been obtained as a result of an unlawful search and seizure. Nothing in appellant's brief or in the oral argument on his behalf suggests to us what evidence it is claimed should have been excluded.

It is true the company-owned automobile used by Dickey was searched more than once prior to his arrest. The record seems clear, however, that this was only with the voluntary consent and permission of Dickey. The testimony concerning his granting of permission was not in any way contradicted. In fact, appellant's attorney concedes in his brief that appellant gave verbal permission for the car to be searched and later signed a written consent to search.

Counsel argues consent does not necessarily establish validity of a search because the consent has to be voluntary. There is nothing in the record before us to suggest the consent was not voluntary. However, since appellant is not claiming any particular evidence obtained though an unlawful search was used against him, over his objection at the time of trial, we will not go into the voluntariness of any particular search.

When Dickey was arrested, the automobile used by him was impounded, and it is claimed on appeal that it was thereafter further searched. In the absence of it being suggested or argued that any evidence was found or used against defendant from such search, however, we will not enter into a discussion as to whether that search was incident to a lawful arrest.

### 5. *Exhibits 45 and 65*

Appellant says the court erred in admitting testimony in reference to State's Exhibit 45, which was a board on which had been mounted items found with decedent's body, and State's Exhibit 65, a receipt for a credit card. As each of these two exhibits were offered into evidence the defense objected. The court each time announced the objection was overruled but did not expressly state the exhibits were received into evidence. After the objections were overruled, both parties and the court treated the exhibits as if they were in evidence.

Counsel for appellant argues only that the "record" does not include items not received in evidence. He fails to explain what difference it makes, or how he claims defendant was prejudiced, or whether he objected to testimony concerning the exhibits on the ground and for the reason such exhibits were not in evidence. The record does not show that defendant did object to testimony concerning these exhibits on any grounds, after objections to the exhibits being admitted were overruled.

■ In the absence of timely objection, with the ground for such objection stated, we will not pretend to discuss this assignment in detail. We will say in passing, where the parties and the trial court treat exhibits as being in evidence after they have been offered in evidence, such exhibits are usually considered to be in evidence. Dodson v. Greuner, 28 Cal.App.2d 418, 82 P.2d 741, 744; In re King's Estate, 202 Okl. 334, 213 P.2d 844, 847.

### 6. *The Knife*

Appellant's sixth contention is that the court erred in allowing testimony regarding the knife which was found near decedent's body, since the knife was not actually offered in evidence. No reason or authority has been shown us for believing such testimony was improper or prejudicial. We find no merit in the contention.

### 7. *The Kidnap Story*

In a single paragraph of appellant's brief, and without the citation of authority, it is contended the court erred in admitting into evidence testimony concerning the time when Dickey falsely claimed to the F.B.I. that he had been kidnapped.

This contention is somewhat inconsistent with appellant's first assignment of error, in which it was contended defendant's credibility was not impeached. If his credibility is a determining factor in deciding whether the jury was bound to accept his story on accidental running down of decedent, then surely—where defendant volunteered to testify—the State was entitled to impeach his credibility.

Dickey admitted on direct examination that he had falsified his expense accounts. Then, on cross-examination, when he admitted he had lied to police officers, he was asked whether ever before he had fabricated or lied about an incident. He answered, "Yes." He was then asked, when. In response to the question of when, he volunteered the details of the fabricated kidnap story.

### 8. *Constitutional Question*

Appellant contends the court erred in admitting into evidence, over defendant's objection, statements made by defendant during "custodial" interrogation prior to his arrest. Counsel bases this contention upon the case of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974.

Counsel correctly states the question to be decided is, at what point in the investigation did the law enforcement officials have

a duty to warn defendant of his constitutional rights? He then points out that according to Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 1765, 12 L.Ed. 2d 977, this duty arises when "the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect * * *." But counsel did not quote all of the statement from *Escobedo* as to when the duty arises. The statement includes much more, part of which is when "the suspect has been taken into police custody * * *."

There were indeed no available eyewitnesses to the killing of Mrs. MacManus and investigating officers had almost nothing to go on in trying to find out who had caused her death. As we read the record, the one fact they did have was that decedent had last been seen at the Avalon Club. One starting point was to find out who had been at this club the night when decedent disappeared.

By finding out who had cashed checks a list of names was obtained. All could be considered suspect to some extent, but not enough to be accused or arrested. When Dickey denied being at the Avalon Club at the time in question, while police knew he had been, it made another point against him but still not enough. There could be other reasons for Dickey denying he was at the club. For example, he was supposed to be on business out of town. Maybe he did not want his wife or his employer to know he was not where he was supposed to be.

Before the investigation could focus on Dickey as a particular suspect, he had to be identified as decedent's companion; and the police needed to find, if possible, a gas can in his possession which could have been used for the gasoline with which decedent had been burned. And so, the investigation continued. Police could not yet accuse, make an arrest, or focus on a particular suspect.

Police asked Dickey to come to the police station, after they had arranged for a waitress from the Avalon Club to be in the station. Dickey went past the waitress and into the office of the chief of police. Outside the chief's office, the waitress identified Dickey as the man who had been with Mrs. MacManus the night she disappeared.

The investigating officer who received the identification immediately walked into the chief's office and introduced Dickey to the chief. Dickey was then informed of his constitutional rights, viz., that he had a right to have an attorney present at this time; that he had the right not to say anything; that anything he said would be used for or against him in court; and that he need not say anything. The chief of police then handed Dickey a telephone book and invited him to use the telephone if he wished to call an attorney. Dickey said he did not want an attorney and wanted to cooperate and help the police in any way he could.

At the trial Dickey admitted he voluntarily talked to the police and was not forced or coerced to make any statements. His attorney does not claim the warning of constitutional rights, when given, was defective in any manner, except that he does suggest defendant was not told he could have a court-appointed attorney if necessary.

It is clear from the record that the police knew Dickey had a responsible job, being the store manager in Casper for Mid-Continent Supply Company, and that he was not indigent. In footnote 43 of the *Miranda* case (86 S.Ct. 1627), it is recognized a warning that the indigent may have counsel appointed need not be given to the person who is known to have ample funds to secure one. Dickey actually did secure his own attorney with his own funds.

Certainly, the police investigation into the killing of Grace MacManus did not cease to be a general inquiry into an unsolved crime, and it did not focus upon Dickey as a particular suspect, until he was identified by the waitress as the com-

panion of Mrs. MacManus on the night of her disappearance. Counsel for appellant agrees this is the point fixed and followed by the trial court as the point in the investigation when officials had a duty to warn defendant of his constitutional rights. We do not find in either *Miranda* or *Escobedo* a requirement for more.

There is indeed a possibility that such warning would have been timely if made when Dickey was arrested and taken into "custody" four days later. Although we need not decide this point, it is of interest to notice that the condemnation against questioning a defendant without warning him of his constitutional rights, in the *Escobedo* case (84 S.Ct. 1765), is when "the suspect has been taken into police custody." Also, in the *Miranda* case (86 S.Ct. 1612), the term "custodial interrogation" is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

### 9. *Cumulative Effect*

Finally, appellant makes a general assignment of error that the total and cumulative effect of improper comments and evidence on the minds of jurors was such as to render ineffective the rulings and admonitions of the court, when it sustained objections of defendant and when it instructed the jury to disregard statements, and that the prejudicial effect remained firmly implanted in the minds of the jurors.

The assignment has not been argued and no authority for it has been cited. Of course, it would be pure speculation if we assumed there was any truth in this statement. There is no merit in the assignment and we need not discuss it. See Ford Motor Company v. Arguello, Wyo., 382 P.2d 886, 892.

We find no reversible error in defendant's trial and the judgment and sentence should stand.

Affirmed.