IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

                  Respondent,

    v.

RIGOBERTO ALVARADO,

                  Appellant,

and DANNY OMAR MENDEZ,
and each of them,

                  Defendants.

No. 85952-8-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — Rigoberto Alvarado appeals his conviction following a jury trial for murder in the first degree, assault in the second degree, and unlawful possession of a firearm in the first degree. He challenges, under ER 403, the admission of the victim's testimony identifying Alvarado as the shooter based on a photograph of him that appeared in a newspaper article after his arrest reporting that prosecutors believed he was the assailant and identifying him as a felon with extensive criminal history. He also challenges the denial of Alvarado's two for-cause challenges, and the admission of testimony that Alvarado provided a fake name to police during an unrelated incident. Finding no error, we affirm.

FACTS

On March 31, 2020, Rigoberto Alvarado entered A&H Motors, an autobody repair shop where Bruce Hood and Gregory Deckman were present. Alvarado produced a firearm and demanded money. When Deckman refused, Alvarado shot him in the chest. Deckman later died from his injuries. After shooting Deckman, Alvarado then turned to Hood and demanded his wallet. As Hood turned in an attempt to take his wallet out of his pocket, Alvarado struck him in the head with the firearm. He then fled the scene with the wallet, pursued briefly by Hood, before escaping in a dark truck.

Hood called 911 and described the suspect as a Hispanic male who was shorter than him and with tattoos. Hood did not provide any details of the tattoos or where he saw them. First responders arrived and took Hood to the hospital where he had to undergo surgery for a fractured skull with bleeding on his brain. Police responded and collected evidence, including DNA from a fired shell casing and an intact cartridge found at the scene.

Surveillance cameras at the autobody shop were not operational. But video recordings from traffic cameras and security footage from nearby businesses identified the vehicle involved as a Toyota Tacoma truck. Prior to arriving at the auto shop, the truck stopped at a Chevron gas station. The gas station's security video shows the truck pull into a pump station. A male exits from the front right passenger seat and opens the door to the right rear passenger seat for a female to exit the vehicle. The video shows the male from a distance, capturing the fact he is wearing a Seahawk's jersey but does not show a clear image of his face. The video, however, clearly captures the female passenger's face as she enters the building at the gas station. Police later identified the

female as Tristin Thomas. And when later interviewed by police, Thomas identified the driver of the vehicle as Danny Mendez and the male passenger as someone she knew as "Nino." She later reluctantly identified Alvarado as "Nino." The video documented the truck's route from the gas station to the crime scene.

According to Thomas, Mendez, Alvarado, and Thomas stopped at a Chevron gas station in an attempt to obtain hot food. After leaving the gas station, the group proceeded to some nearby apartment complexes before continuing to the parking lot of A&H Motors. Once they pulled into the parking lot and parked, Alvarado exited the front passenger seat and grabbed something from near a fence. Alvarado then instructed Mendez, the driver, to wait, saying, "I'll be right back. Don't leave me." Nearby camera surveillance footage recorded an individual in a Seahawks jersey number 29 get out of the vehicle and then grab something. The footage then shows the same person enter A&H Motors through the front door. After Alvarado left them, a gunshot was heard. Alvarado then came running back to the truck, and as the group drove away Mendez asked Alvarado "if he shot him." Alvarado responded "yes." Mendez asked him why, and, according to Thomas, Alvarado responded that he "wasn't listening and wasn't moving fast enough." The truck then left at a high speed.

Law enforcement eventually located the truck, though the vehicle had been altered. The step-ups had been removed. The rims spray-painted and a decal appeared to have been removed from the rear windshield. Upon processing the vehicle, latent print examiners discovered Alvarado's fingerprints on the rear passenger-side door, consistent with surveillance video showing him opening the door for Thomas.

On April 11, other police officers investigating a non-related report of trespassing

3

made contact with Alvarado at a vacant property. During that investigation, Alvarado initially falsely identified himself as "Pablo Reyes." The State, later at trial, was permitted over defense objection, to introduce testimony that Alvarado gave a false name at the time of his arrest.

By April 16 the State had enough information to arrest and charge Alvarado with murder in the first degree, assault in the second degree, and unlawful possession of a firearm in the first degree. Hood was never asked to identify the shooter through a photo montage. On April 20, *The Seattle Times* published an article about the robbery, which included a photograph of Alvarado that showed large tattoos on his forehead. The April 20 article reported that prosecutors believed Alvarado committed the robbery two weeks after his release from prison. The article also detailed Alvarado's criminal history, which includes 13 felony convictions.

Hood read *The Seattle Times* article and viewed the photograph of Alvarado in the article more than once. It was not until a defense interview in January 2023, conducted with the prosecutor present, that Hood first shared that he read the article, viewed the photograph of Alvarado and recognized him as the individual who had murdered Deckman and assaulted Hood.

The case proceeded to trial in August 2023. Over the course of voir dire, Alvarado raised six challenges for-cause. The trial court granted one and denied the others. Alvarado exhausted his peremptory strikes on jurors other than two jurors he had previously challenged for cause: jurors 57 and 111. Alvarado accepted the jury with jurors 57 and 111 on the panel.

After the trial court ruled that Hood would not be allowed to make an in-court

identification, the prosecutor obtained the photograph from *The Seattle Times* article and confirmed with Hood that he identified Alvarado as the assailant through that photograph. Over defense objection, the State was permitted to admit the photograph of Alvarado from the article and elicit Hood's testimony that the person in the photograph was the assailant. Thomas also testified at trial. She identified Alvarado as the other passenger in the truck and spoke of their activities the day of the shooting. Additional facts are discussed further below where relevant.

The jury found Alvarado guilty as charged.

Alvarado appeals.

## DISCUSSION

### For-cause Challenge Waiver

Alvarado contends that jurors 57 and 111 were biased and that the trial court erred when it allowed them to sit on the jury panel.

The trial court allocated nine peremptory challenges to each party. Alvarado challenged six jurors for cause: 10, 18, 57, 110, 111, and 147. The court excused juror 147 but otherwise denied all the other for-cause challenges.

At the time the court entertained peremptory challenges, juror 57 was part of the potential petit jury. Alvarado used his first four peremptory challenges to strike jurors 10, 18, 32, and 110, which as a result moved juror 111 into the potential petit jury. At that time, Alvarado had five remaining peremptories. He chose to exercise them against jurors who he had not challenged for cause.[1] Alvarado accepted the jury with jurors 57 and 111 seated on the panel.

---

[1] The court granted his request to strike jurors 117, 137, 156, 76, 128.

5

The Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution both guarantee criminal defendants the right to trial by an impartial jury. U.S. CONST. amend VI; WASH. CONST. art., I § 22. But "the burden of preventing trial errors rests squarely upon counsel for both sides." State v. Farley, 48 Wn.2d 11, 15, 290 P.2d 987 (1955). Even defense counsel in a criminal case must attempt to correct errors at trial, rather than saving them for appeal "in case the verdict goes against [them]." Id.

The State argues that this case is analogous to State v. Kovalenko, 30 Wn. App. 2d 729, 546 P.3d 514 (2024), and that Alvarado waived his right to assert a claim based on the trial court's denial of his for-cause challenge to jurors 57 and 111. We agree.

Our Washington Supreme Court recently reaffirmed its holding that a party who fails to use an available peremptory strike on a juror previously challenged for cause, who then affirmatively accepts the panel, waives any subsequent claim of error as to that juror's seating. State v. Talbott, 200 Wn.2d 731, 737-38, 521 P.3d 948 (2022). This Court extended that principle in Kovalenko.

In Kovalenko, after the defendant had two for-cause challenges denied he still had six available peremptory challenges. 30 Wn. App. 2d at 738-39. However, the defendant failed to use any of his available peremptory challenges on the juror that he had unsuccessfully moved to excuse for cause. Id. Instead, the defendant used his six peremptory strikes on other jurors, none of whom he had attempted to challenge for-cause. Id.

Under Kovalenko, the inquiry, for purposes of waiver, is not simply whether a party exhausted its peremptory challenges by the end of jury selection, but whether the

party had the opportunity to remove a challenged juror and affirmatively chose not to do so. The Kovalenko court reasoned that declining to apply waiver in such circumstances would encourage gamesmanship, effectively incentivizing a defendant to allow a potentially biased juror to remain on the panel, not to protect the right to a fair trial, but to preserve a fallback basis for reversal on appeal. Id. at 738–39.

In the instant case, after the trial court denied Alvarado's for-cause challenge to juror 57, Alvarado still possessed all nine of his peremptory challenges. He could have removed juror 57 from the panel at any point thereafter but did not. Alvarado still had four peremptory strikes available after the trial court denied his for-cause challenge to juror 111. Alvarado declined to exercise a peremptory strike on juror 111. Instead, he chose to remove other jurors who had not been challenged for cause and accept the panel knowing it included jurors 57 and 111.

Alvarado attempts to distinguish Kovalenko. He contends that unlike in Kovalenko, where the Court warned against manipulation of peremptory challenges, he used his challenges in good faith. Alvarado asserts that he excluded jurors with identifiable bias, not for gamesmanship. However, he provides no argument or explanation as to why a different result should be reached where a party elects to exhaust its peremptory challenges on jurors who were never challenged for cause. He offers no rationale that would justify a decision for us to depart from the legal principles as articulated in Talbott and applied in Kovalenko.

We follow Kovalenko and conclude that Alvarado waived his right to challenge the denial of his for-cause challenges against jurors 57 and 111.

<u>False Name</u>

The trial court denied Alvarado's motion to exclude, under ER 403,[2] testimony that Alvarado gave arresting officers a false name. Alvarado contends that because the arresting officers were investigating an unrelated matter the trial court abused its discretion. He further asserts that he was on community custody at the time of his arrest, and that the most probable reason he gave a false name was to avoid a custody violation, not because of any consciousness of guilt related to the murder or assault charges. He further argued that, to rebut the State's inference of guilt, he would be forced to reveal his custodial status to the jury, thereby introducing additional prejudicial information.

The court explained that the false name was relevant because it allowed the State to argue consciousness of guilt, a permissible inference from the facts. It further found the evidence was not unfairly prejudicial and deemed it fair for both parties to argue its significance to the jury.

Alvarado argues that his alternative explanation is sufficient enough to overcome the State's consciousness of guilt claim, thereby rendering the court's decision to admit the false name evidence as manifestly unreasonable. We disagree.

Generally, "[a]ll relevant evidence is admissible." ER 402. We review a trial court's decision to admit or exclude evidence for abuse of discretion. <u>State v. DeVincentis</u>, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). "There is an abuse of discretion when the trial court's decision is manifestly unreasonable or based upon untenable grounds or reasons." <u>State v. Brown</u>, 132 Wn.2d 529, 572, 940 P.2d 546 (1997).

---

[2] Alvarado raised other arguments below that he no longer argues on appeal.

8

Relevant evidence is any evidence which has a tendency to make the existence of any fact that is of consequence to the determination of the issue more probable or less probable than it would be without the evidence. ER 401; State v. Lough, 125 Wn.2d 847, 861-62, 889 P.2d 487 (1995). Overall, "[t]he threshold to admit relevant evidence is very low" and "[e]ven minimally relevant evidence is admissible." State v. Darden, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002).

Alvarado, citing State v. Chase, 59 Wn. App. 501, 799 P.2d 272 (1990), contends that there must be a connection between the act of showing a consciousness of guilt and the crime charged. Here, Alvarado argues, that there is nothing in the record to demonstrate that the reason he gave police a false name was to evade detection for the charged murder and assault. However, Alvarado misconstrues the holding in Chase.

In Chase, police responded to a burglary at a video store. As police arrived at the store, they saw two men running from the scene, whom the police chased on foot, before eventually finding three suspects involved in the crime. Id. at 502-03. Police captured the second suspect who gave the name Lee Parcurich, and the third suspect, who identified himself as Ken Coldeen. Id. Coldeen was later identified as Brian Chase. Id. at 504.

The Chase court held that the admission of the false names was proper because it tended to show consciousness of guilt, and thus to further inferences of identity and criminal intent. Id. at 507. Alvarado relies on the factual distinction in Chase to suggest a holding it did not make. The Chase court did not hold that giving a false name to avoid detection is only admissible as consciousness of guilt when the false name is given to officers investigating the crime at issue as Alvarado suggests.

The proper standard, as clarified in State v. Freeburg, is whether the defendant's conduct supports a reasonable inference of consciousness of guilt. 105 Wn. App. 492, 497-98, 20 P.3d 984 (2001). Under Freeburg, evidence of "resistance to arrest, concealment, assumption of a false name, and related conduct are admissible if they allow a reasonable inference of consciousness of guilt of the charged crime." Id. The inference must be substantial and real, not speculative, but Alvarado cites to no authority that requires the conduct occur during an active investigation or immediately following the crime. When a party cites no authority in support of a proposition, this court may assume counsel has found none. DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

It is reasonable for a jury to infer that at the time Alvarado gave the police a false name, he was aware that he had shot someone and assaulted another. It follows that another reasonable inference is that police would be trying to find the person who committed the crimes and widely shared information on what the assailant looked like with all law enforcement.

The fact that Alvarado may have another explanation as to why he gave a false name goes to weight, not admissibility. A jury could have accepted or rejected Alvarado's alternative explanation, should he have elected to introduce such testimony regarding his community custody, which he was free to do as well as request a limiting instruction as to such evidence. It is the jury's role to make credibility determinations. State v. Smith, 31 Wn. App. 226, 228, 640 P.2d 25 (1982). The fact that the jury may be asked to do so does not mean that the inference that Alvarado gave a false name to avoid detection of the charged crimes is speculative, conjectural, or fanciful. See

10

Freeburg, 105 Wn. App. at 498. Moreover, Alvarado certainly could have more than one reason to have given a false name. Even so, that does not mean the evidence is not relevant.

The next question is whether the "probative value is substantially outweighed by the danger of unfair prejudice" because even relevant evidence may be excluded. ER 403. Evidence causes unfair prejudice when the evidence is "'more likely to arouse an emotional response than a rational decision by the jury.'" State v. Cronin, 142 Wn.2d 568, 584, 14 P.3d 752 (2000) (quoting State v. Gould, 58 Wn. App. 175, 183, 791 P.2d 569 (1990)). And "the burden of demonstrating unfair prejudice is on the party seeking to exclude the evidence," which in this case is, Alvarado. State v. Burkins, 94 Wn. App. 677, 692, 973 P.2d 15 (1999).

Applying a manifest abuse of discretion standard, we give a great deal of deference to the trial court's "evaluation of relevance under ER 401 and its balancing of probative value against its prejudicial effect or potential to mislead under ER 403." State v. Luvene, 127 Wn.2d 690, 706-07, 903 P.2d 960 (1995). Abuse exists when the trial court's exercise of discretion is "manifestly unreasonable or based upon untenable grounds or reasons." Darden, 145 Wn.2d at 619.

Alvarado relies on State v. Slater, 197 Wn.2d 660, 486 P.3d 873 (2021), in support of his ER 403 argument. In Slater, the defendant failed to appear (FTA) for trial after being charged with felony violation of a domestic violence no contact order. 197 Wn.2d at 665-66. Following the FTA, the trial court issued a bench warrant. Id. at 666. Approximately one month later, the defendant appeared to quash the warrant. Id. The Supreme Court found that evidence of a single FTA accompanied by a prompt motion to

11

quash the issued warrant is not sufficient evidence of flight and, therefore, cannot be used as evidence from which to infer consciousness of guilt on the underlying crime. Id. at 670-71.

Slater is wholly distinguishable. Slater was not attempting to avoid detection as to who he was. He simply failed to show up for court and then showed up, himself, to quash the warrant. That simply could not constitute evidence of "flight" to support a consciousness of guilt inference. Id. at 671. Thus, the prejudicial effect of introducing Slater's FTA outweighed any minimal relevance of his FTA. Id. at 668. In the instant case, as discussed above, it is reasonable that a jury could infer that Alvarado intentionally gave police a false name to avoid detection.

While it may be true that Alvarado's alternative explanation of giving a false name entails introducing evidence that is prejudicial to Alvarado, that is of no matter here. The question is not whether a defense theory is potentially prejudicial. The State has no control as to what Alvarado may testify to. While all evidence unfavorable to a defendant carries some risk of prejudice, ER 403 only bars admission when that prejudice substantially outweighs the evidence's value to the case. Moreover, Alvarado made no attempt to mitigate the risk of prejudice. After the trial court issued its ruling, defense counsel alerted the court of the possibility of Alvarado requesting a limiting instruction. The trial court expressly responded, stating that "it's something I would always consider." However, at the time the State introduced the testimony, Alvarado did not request a limiting instruction.

We conclude the trial court did not abuse its discretion in admitting evidence that Alvarado provided a false name to police.

<u>Newspaper Photo Identification</u>

The defense theory at trial was identity. Alvarado has prominent tattoos on his forehead. During the 911 call and follow-up with detectives, Hood never mentioned the tattoos with any detail. Police never attempted to present Hood with a photo montage of any suspect.

During motions *in limine*, Alvarado moved to bar Hood from making an in-court identification of Alvarado. During argument, defense alerted the court that Hood had seen photographs of Alvarado in the media and that the only time Hood had indicated that he believed Alvarado was the assailant was three years after the shooting. The court applied the <u>Biggers</u>[3] factors and concluded that Hood's potential in-court identification carried significant risk of prejudice and should be excluded under ER 403. The court explained that when it considered the <u>Biggers</u> factors of opportunity of the witness to observe, the degree of attention, the accuracy of the description prior, the certainty at the confrontation and the length of time that elapsed,

> I just have so many concerns about Mr. Hood now adding in the facts that it appears that he's done his own research to see photos in the media or photos elsewhere of Mr. Alvarado. He had a minimal opportunity to observe. That observation was under the extreme stress of seeing, at least allegedly, his friend shot to death in front of him. And having a gun in his face, perhaps. And at least spending part of that time facing the other way as he reached for his wallet. And then immediately after suffering a serious head injury that required surgery. He gave a description at that time that did not include, as far as I can tell, the pretty prominent facial tattoos which are in photos a couple weeks later, which I think arguably were there at the time.

Following the court's ruling and after defense gave its opening statement, the State pursued an alternative method of identification based on *The Seattle Times* article

---

[3] <u>Neil v. Biggers</u>, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

Hood had referenced during a defense interview in January 2023. Prior to Hood testifying and outside of court, the prosecutor searched online and located the April 2020 article that included a photograph of Alvarado and showed the article containing Alarado's photo to Hood. Hood confirmed that this was the photo he had seen earlier and identified the individual pictured as the assailant. The State notified the court of its intent to admit the photograph and have Hood identify the individual in the photograph as the person who assaulted him and shot Deckman.

Alvarado objected arguing that the danger of unfair prejudice from the photo identification is the same reason the trial court correctly barred Hood from making an in-court identification:

> The Court has said in its analysis that [asking Hood to identify the defendant in court] would be zeroing in on one person. But I would point out to the Court that this article also zeros in on one person. It doesn't provide numerous different options. It in fact only shows one person. And not only does it show only one person, it shows only one person that is arrested and then is called a felon, and indicates that this occurred two weeks from release from prison.
> So it's substantially similar with respect to the actual practical outcome. And then it puts defense in a position where we really cannot cross-examine on this material without bringing in things about prior criminal history that really the jury should not hear.

The trial court acknowledged that the circumstances surrounding Hood's viewing of the photograph were highly suggestive but appeared to focus on the fact that someone, other than the State, was responsible for sending *The Seattle Times* article to Hood, and that defense could cross-examine regarding the circumstances of the identification. The court explained

> In terms of, in terms of Mr. Hood's own memories that he's testifying to today; how he came to possess those memories that he's going to express on the stand, I continue to think it's fair game for both sides to explore. Both whether it's just from the 10 seconds or so that he appears

14

> to have seen someone in the store; or whether it's through doing his own research or doing other things, I would have given both parties pretty, especially the defense, pretty free reign to explore with them those questions.
>
> ….
>
> If this were a matter of, and maybe this is slicing it too fine, but I don't know how else to do it. If this were a matter of the State for the first time doing a one packet montage or a one photo montage and showing Mr. Hood for the first time that photo, obviously that would be out. Because that would be impermissibly suggestive.

The court ruled that it would not permit the State to introduce the article, but concluded,

> I don't find that showing the photo in the course of asking Mr. Hood what he did to remember, or perhaps to jog his memory or other things like that would, that the probative value would be substantially outweighed by the danger of unfair prejudice in the same way that the in-court ID does.

When the trial court earlier had barred in-court identification, it remarked that other safeguards of mitigating the suggestibility of an in-court identification were not practical, such as having Alvarado sit elsewhere in the courtroom. The trial court noted that it would not be possible to have others in the courtroom who had the same facial tattoos as Alvarado.

Alvarado argues that "[h]ad the court applied the same factors to the [sic] Hood's newspaper identification, as it did to his proposed in court identification, it is clear the court would have excluded it." Alvarado argues that the trial court erred in its ER 403 analysis because it "failed to exercise discretion to exclude the evidence."

Under ER 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. State v. Coe, 101 Wn.2d 772, 782, 684 P.2d 668 (1984). A trial court's decision on whether to admit an out-of-court identification is reviewed for abuse of discretion. State v. Sanchez, 171 Wn. App.

15

518, 579, 288 P.3d 351 (2012). A trial court abuses its discretion if any of the following is true:

> (1) The decision is "manifestly unreasonable," that is, it falls "outside the range of acceptable choices, given the facts and the applicable legal standard";
>
> (2) The decision is "based on untenable grounds," that is, "the factual findings are unsupported by the record"; or
>
> (3) The decision is "based on untenable reasons," that is, it is "based on an incorrect standard or the facts do not meet the requirements of the correct standard."

State v. Dye, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013) (quoting In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)). Alternatively, a trial court abuses its discretion when no reasonable judge would have ruled as the trial court did. State v. Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)).

We acknowledge that the facts presented in the instant case are novel. Most criminal witness identification cases arise following State action that involve a police-initiated lineup or photomontage. As the trial court acknowledged, had the State asked Hood to decide whether the single photograph of someone with a facial tattoo was the assailant, it would be undisputed that the identification would be obtained through unacceptable suggestive procedures. Here, not only did Hood only view a single photograph of Alvarado with a facial tattoo, he did so while reading that prosecutors believed him to be the assailant and that Alvarado was a felon. The absence of state-actor involvement in the identification process does not eliminate concerns about the reliability of the identification.

The trial court observed that the question as to whether Hood's identification of Alvarado was based on his own memory that was triggered by the photograph or a

16

memory that was suggested by the photograph would be left for the parties to test through direct and cross examination. Alvarado does not raise a due process challenge and no longer disputes on appeal that the "suggestibility" of the means by which Hood identified Alvarado did not involve state action.

As this court observed in State v. Sanchez, "the United States Supreme Court held that the Constitution 'protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit.'" 171 Wn. App. 518, 572, 288 P.3d 351 (2012) (quoting Perry v. New Hampshire, 565 U.S. 228, 237, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012)). As the Perry court reasoned

> Constitutional safeguards available to defendants to counter the State's evidence include the Sixth Amendment rights to counsel, compulsory process, and confrontation plus cross-examination of witnesses. Apart from these guarantees, we have recognized, state and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence presented at trial. Only when evidence "is so extremely unfair that its admission violates fundamental conceptions of justice" have we imposed a constraint tied to the Due Process Clause.

565 U.S. at 237 (internal citations omitted) (quoting Dowling v. United States, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990)).

Alvarado argues that the trial court had the discretion to consider eyewitness identification reliability factors under ER 403 as other states such as Oregon have done, citing as an example, State v. Lawson, 352 Or. 724, 743-44, 291 P.3d 673 (2012). In Lawson, the Oregon Supreme Court revised its test governing the admissibility of

identification evidence, the Classen test,[4] that was created more than three decades prior when there was no statutory evidence code. Lawson, 352 Or. at 746, 749. The court recognized the voluminous body of scientific knowledge developed on the subject of eyewitness identification and concluded that in light of scientific findings discussed, Oregon's Classen test was no longer adequate and needed revision. Id. at 750. The new test required the proponent of the identification evidence to demonstrate by a preponderance of the evidence that the witness perceived sufficient facts to support an inference of identification and that the identification was, in fact, based on those perceptions. Id. at 754. Oregon courts also "must examine the relative reliability of evidence produced by the parties to determine the probative value of the identification." Id. at 757. Notably, the two cases that were before the Oregon Supreme Court in Lawson both involved state action related to circumstances that were "highly suggestive" or "unduly suggestive." Id. at 764, 766. Whether our state wishes to follow Oregon's example is a question better suited for our Supreme Court.

What is before us is whether the trial court abused its discretion in ruling that Hood's identification of Alvarado through the photograph was admissible. Alvarado cites to no authority that required the trial court to apply the reliability factors from Biggers in its ER 403 analysis. And contrary to Alvarado's assertion that the trial court failed to exercise its discretion, the record shows that the trial court did indeed exercise its discretion. In fact, the trial court expressly considered the Biggers factors as "relevant in a 403 sense" when it considered whether to allow Hood to make an in-court identification. The trial court distinguished its ruling as to the in-court identification

---

[4] State v. Classen, 285 Or. 221, 232, 590 P.2d 1198 (1979), abrogated on other grounds by State v. Haugen, 361 Or. 284, 392 P.3d 306 (2017).

explaining that "my exclusion for what [Hood] could do in court was zeroing in on the one person who is sitting at that table, and saying 'Oh, that's the guy'. "Because that, I think, has so many problems based on how we got here, that that act I found was danger of unfair prejudice substantially outweighed the probative value."

Alvarado has not met his burden to establish that the trial court abused its discretion in allowing the parties to test the reliability of Hood's identification through direct and cross examination. The record supports that Alvarado was able to do just that. Even if it could be argued that the trial court erred in allowing Hood's identification testimony, any such error was harmless.

The record contains substantial additional and independent evidence linking Alvarado to the crimes. A live round of ammunition and a fired bullet shell casing were found at the crime scene that bore DNA matching Alvarado. The shell casing identified Alvarado as a possible contributor among a mixed profile of three possible contributors. The live round DNA testing determined Alvarado as the sole contributor. Surveillance video footage placed a man wearing a Seahawks jersey, who was later identified to be Alvarado by Thomas, at a Chevron gas station near the scene shortly before the offense. The video footage showed Alvarado exit the vehicle wearing the same Seahawks jersey captured by surveillance video when he was fleeing the crime scene. Additionally, Thomas testified to hearing a gunshot from the vehicle, to Alvarado running back to the truck, and to the inculpatory statements Alvarado made to Mendez in the truck immediately after the shooting. After law enforcement located the getaway vehicle, a latent print examination determined that Alvarado's fingerprints were found on the

19

truck's rear passenger side door, which Alvarado can be seen touching from the Chevron surveillance footage.

Alvarado raises understandable concerns as to the reliability of Hood's identification through the photograph that appeared in *The Seattle Times*. But we give great deference to the trial court in its evaluation of relevance under ER 401 and its balancing of probative value against its prejudicial effect or potential to mislead under ER 403. Thus, Alvarado has not established that the trial court manifestly abused its discretion. And even if admitting the identification testimony was error given the facts and circumstances of how Hood came to view Alvarado's photograph, the error was harmless given the overwhelming evidence linking Hood to the crime.

We affirm.

_Coburn, J._

WE CONCUR:

_Feldman, J._          _Díaz, J._