**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

STATE OF WASHINGTON,

                    Respondent,

        v.

SERGEY ANDREEVICH
KOVALENKO,

                  Appellant.

No. 84404-1-I

DIVISION ONE

PUBLISHED OPINION

MANN, J. — Sergey Kovalenko was convicted by a jury of multiple counts of child molestation and rape of a child. Kovalenko appeals his conviction and argues that (1) the trial court abused its discretion in failing to dismiss a juror for cause and not sua sponte dismissing a juror who expressed actual bias, (2) the court erred when portions of the trial were not interpreted for Kovalenko, (3) the court violated the Washington Constitution when it gave the jury a no-corroboration instruction, and (4) the prosecutor committed misconduct. We affirm.

I

A

Kovalenko was born in the USSR and immigrated to the United States with his wife in 1987. Kovalenko has 17 children, 12 sons and 5 daughters. The family built and lived in a home on five acres in Whatcom County.

The children's daily lives included going to school, doing chores, and attending church twice per week. The older children often helped take care of the younger children. The girls were responsible for chores inside the home, including cleaning, laundry, and preparing food. The boys were responsible for projects outside the home including tending to animals.

While they attended public school, the girls felt that they stood out because of the clothing they wore and because their family did different things from other families. The children were expected to speak only Russian at home. The transition to speaking and learning English in school was challenging for them. The children were not involved in after school events provided at the school. The children's friends were rarely allowed to come to the house and the girls were not allowed to go to friends' houses or attend sleepovers.

The girls were taught that pants were for boys, not girls, and that it was not Christian for girls to wear pants. The girls were not allowed to cut their hair or wear makeup. To move out of the home, the girls had to get married. They were not allowed to tell their father "no."

The oldest daughter, L.K., moved out of the family home after she got married at nineteen. L.K. later disclosed to her husband that Kovalenko had abused her during her childhood. L.K. presumed that she had been the only daughter Kovalenko abused. But when L.K. received a call from her sister K.K., who was crying and very upset, L.K. became concerned for her sisters. L.K. confronted Kovalenko in front of her mother and asked if he was touching her sisters, Kovalenko denied it. L.K. told Kovalenko that if she found out he was abusing her sisters, she would go to law enforcement.

L.K. then spoke with her aunts about the abuse she experienced and one aunt reported it to the Whatcom County Sheriff's Office. L.K. spoke with Detective Kevin Bowhay and gave a written statement about Kovalenko's abuse.

Detective Bowhay began an investigation and spoke with daughters C.K., E.K., and K.K. at the family home. Both C.K. and E.K. disclosed that Kovalenko had molested them repeatedly for several years.

Kovalenko was charged with multiple counts of child molestation and rape of a child.

B

Three of Kovalenko's daughters testified against him at trial: L.K., C.K., and E.K. Because of health issues, the parties agreed to take E.K.'s testimony by video deposition. They also agreed that the testimony would be played and admissible at trial.

After E.K.'s recorded testimony was played for the jury, jurors reported trouble hearing it. The agreed upon solution was to prepare a transcript of the testimony and reenact it with an "actor" reading E.K.'s responses.

Following Kovalenko's direct testimony, jurors reported issues hearing the testimony. Defense counsel suggested the same remedy as with E.K.'s testimony: providing a transcript and reading it. The parties agreed to reenact Kovalenko's direct testimony with an "actor" the next morning before his cross-examination.

The jury found Kovalenko guilty of rape of a child in the first degree, two counts of child molestation in the first degree, five counts of child molestation in the second degree, and three counts of child molestation in the third degree. Kovalenko was

sentenced to standard range indeterminate sentences for the rape and child molestation in the first degree counts, and standard range sentences for the remaining counts.

Kovalenko appeals.

II

Kovalenko contends that juror 9 was biased and the trial court erred in allowing juror 9 to sit on the jury panel. The Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution both guarantee criminal defendants the right to trial by an impartial jury. U.S. CONST. amend VI; WASH. CONST. art., I § 22. But "the burden of preventing trial errors rests squarely upon counsel for both sides." State v. Farley, 48 Wn.2d 11, 15, 290 P.2d 987 (1955). Even defense counsel in a criminal case must attempt to correct errors at trial, rather than saving them for appeal "in case the verdict goes against [them]." Farley, 48 Wn.2d at 15.

A

Kovalenko first argues that the trial court erred by denying his motion to strike juror 9 for cause. Because Kovalenko could have removed juror 9 using one of his peremptory challenges, but did not, we conclude that Kovalenko waived his right to appeal the trial court's decision denying his motion to excuse juror 9 for cause.

In State v. Talbott, 200 Wn.2d 731, 521 P.3d 948 (2022), our Supreme Court considered whether a party who declines to remove a prospective juror with an available peremptory challenge has the right to appeal the seating of that juror.[1] The

---

[1] While Talbott was cited and discussed briefly in the opening brief and oral argument, because of its importance to our analysis, the parties were asked to submit supplemental briefing addressing whether Kovalenko waived his right to challenge juror 9 on appeal.

trial court denied Talbott's motion to excuse a prospective juror for cause and Talbott failed to remove the juror with a peremptory challenge, affirmatively accepting the jury panel with at least two peremptory challenges still available to him. Talbott, 200 Wn.2d at 732. Talbott appealed the judge's decision denying his motion to excuse the juror. Talbott, 200 Wn.2d at 732.

To determine whether Talbott's challenge was proper on appeal, the Talbott court clarified the distinction between two lines of cases: those based on State v. Clark, 143 Wn.2d 731, 24 P.3d 1006 (2001) and those based on State v. Fire, 145 Wn.2d 152, 34 P.3d 1218 (2001). Talbott, 200 Wn.2d at 732.

The Clark line of cases addressed parties who did not try to use their peremptory challenges to cure an alleged jury-selection error. "Cases in the Clark line hold that if a party 'accepted the jury as ultimately empaneled and did not exercise all of [their] peremptory challenges,' then they do not have the right to appeal 'based on the jury's composition.'" Talbott, 200 Wn.2d at 738 (quoting Clark, 143 Wn.2d at 762). This line of cases "thus encourages parties to cure jury-selection errors with their peremptory challenges." Talbott, 200 Wn.2d at 738. "This ensures that peremptory challenges are properly used to promote a defendant's right to 'an impartial jury and a fair trial' in the first instance." Talbott, 200 Wn.2d at 738 (quoting State v. Lupastean, 200 Wn.2d 26, 48, 513 P.3d 781 (2022), and Georgia v. McCollum, 505 U.S. 42, 57, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992)).

In contrast, the Fire line of cases "addresses parties who did use their peremptory challenges to cure jury-selection errors and subsequently exhausted their peremptory challenges." Talbott, 200 Wn.2d at 739. Fire held that a "'defendant's

rights [are] not violated simply because [they] had to use peremptory challenges to achieve an impartial jury.'" Talbott, 200 Wn.2d at 739 (quoting Fire, 145 Wn.2d at 165). "Thus, unlike Clark, Fire did not ask whether a party must use their peremptory challenges to cure an alleged jury-selection error. Instead, Fire asked whether a party who does curatively use their peremptory challenges is entitled to reversal on appeal." Talbott, 200 Wn.2d at 739.

In reaching its decision, the Talbott court rejected as dicta language in Fire that suggested that if a defendant believed a juror should have been excused for cause, the defendant could elect not to use a peremptory challenge, allow the jury to be seated with the objected to juror, and then win reversal on appeal if they showed the trial court abused its discretion in not dismissing the juror for cause. Talbott, 200 Wn.2d at 739. In doing so, the court explained, "there are good reasons to require parties to use their available peremptory challenges to cure jury-selection errors. Doing so promotes a defendant's right to receive a fair trial in the first instance and prevents unnecessary retrials." Talbott, 200 Wn.2d at 746 (citing Ross v. Oklahoma, 487 U.S. 81, 90, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988)). "This helps to ensure that peremptory challenges are used to 'promote, rather than inhibit, the exercise of fundamental constitutional rights.'" Talbott, 200 Wn.2d at 746 (quoting Lupastean, 200 Wn.2d at 52). The court also explained, that allowing defendants not to use available peremptory challenges, "could improperly discourage counsel from curing potential jury-selection errors with peremptory challenges in order to obtain reversal on appeal." Talbott, 200 Wn.2d at 746-47.

The Talbott court concluded that "if a party allows a juror to be seated and does not exhaust their peremptory challenges, then they cannot appeal on the basis that the juror should have been excused for cause." 200 Wn.2d at 747-48. Because Talbott did not seek to strike the contested juror with an available peremptory challenge, did not exhaust his peremptory challenges on other jurors, and accepted the jury panel as presented—including the challenged juror—he was not entitled to have his for-cause challenge considered on appeal. Talbott, 200 Wn.2d at 747-48.

Kovalenko correctly asserts that his case is unlike Talbott because he exhausted his peremptory challenges.[2] But Kovalenko did not exhaust his peremptory challenges before he had a chance to strike juror 9. Kovalenko had only two for-cause challenges denied by the trial court: his challenges to jurors 9 and 52. Kovalenko had six peremptory challenges available to him.[3] After his for-cause challenge to juror 9 was denied, it was clear that Kovalenko would have to use a peremptory challenge to strike juror 9 based on the juror's low juror number in the jury venire. While Kovalenko had six opportunities to do so, he instead exhausted his peremptory challenges on jurors 34, 21, 13, 25, 22, and 1—none of whom he challenged for cause.[4] Juror 52 was excused with all the remaining jurors who were not seated.

Kovalenko argues that if we were to expand Talbott to apply to this situation, "such a rule would usurp counsel's autonomy to exercise peremptory challenges in a way that counsel believes would be most conducive to seating a fair and impartial jury."

---

[2] The Talbott court expressly declined to consider the situation before us: "Our holding is limited to the facts in this case, and we express no opinion on the analysis that applies where a party exhausts their peremptory challenge and objects to the jury panel." 200 Wn.2d at 733.

[3] Both parties had additional peremptory challenges for the alternate jurors.

[4] Kovalenko used a seventh peremptory to remove juror 39 as a potential alternate juror.

But counsel had only two for-cause challenges denied by the trial court and if counsel had been concerned that the seating of juror 9 would not result in a fair and impartial jury, counsel had six opportunities to strike juror 9. Instead, counsel did not strike juror 9 and accepted the jury panel. As in Talbott, Kovalenko's approach could improperly discourage counsel from curing potential jury-selection errors with peremptory challenges in order to obtain reversal on appeal. 200 Wn.2d at 746-47. Such an approach fails to ensure peremptory challenges are properly used to promote a defendant's right to an impartial jury and a fair trial. Talbott, 200 Wn.2d at 738 (citing Lupastean, 200 Wn.2d. at 48).[5]

This reasoning tracks Division Three's decision in State v. Munzanreder, 199 Wn. App. 162, 398 P.3d 1160 (2017). In Munzanreder, the defendant had six peremptory challenges and there were only two venire jurors that he had unsuccessfully challenged for cause that could have been seated. While Munzanreder used all six peremptory challenges, he did not use them on the jurors he challenged for cause. Division Three of this court held that Munzanreder waived any error as to the jurors unsuccessfully challenged for cause.

> Here, Munzanreder used one challenge to remove venire juror 49, but elected not to use any of his several other peremptory challenges to remove venire juror 51. He also elected not to request additional peremptory challenges. If the trial court erred in denying Munzanreder's for cause challenge of venire juror 51 with his allotted peremptory

---

[5] Kovalenko also argues that because his trial predated Talbott, his counsel did everything required to preserve the for-cause challenge under the dicta in Talbott. But Talbott not only held the statement in Fire was dicta, it also expressly overruled "opinions that have relied on Fire's dicta to hold that a party need not cure jury-selection errors with their available peremptory challenges." 200 Wn.2d at 744.

challenges or by requesting additional challenges, Munzanreder waived that error.

Munzanreder, 199 Wn. App. at 179-180.

We hold, consistent with Munzanreder, and the policy outlined in Talbott, that a party that unsuccessfully challenges a potential juror for cause, and then does not use any of their peremptory challenges to remove the challenged juror, and instead accepts the jury panel with the challenged juror, waives the right to have the for-cause challenge considered on appeal.

Kovalenko therefore waived the right to challenge the trial court's decision denying his motion to excuse juror 9 for cause.

B

Kovalenko next argues that the trial court erred when it failed to sua sponte dismiss juror 9 after juror 9 expressed actual bias in relation to Kovalenko's national origin and use of an interpreter. We disagree.

Even when a party does not move to strike a juror, "a trial court must do so on its own motion where grounds for a challenge for cause are apparent in the record." State v. Gutierrez, 22 Wn. App. 2d 815, 820, 513 P.3d 812 (2022). Under RCW 2.36.110, the trial court has a duty "to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias [or] prejudice." Gutierrez, 22 Wn. App. 2d at 820. But a trial court should exercise caution before injecting itself into the jury selection process. State v. Lawler, 194 Wn. App. 275, 284, 374 P.3d 278 (2016). "Trial counsel may have legitimate, tactical reasons not to challenge a juror who may have given responses that suggest some bias." Lawler, 194

Wn. App. at 285. We review a trial judge's failure "to inquire further or excuse [a] juror sua sponte" for abuse of discretion. Gutierrez, 22 Wn. App. 2d at 822.

In Gutierrez, a potential juror stated several times he was concerned that Hispanic and Latinx defendants were not asked if they were U.S. citizens. 22 Wn. App. 2d at 818. The juror later expressly asked if the defendant was a U.S. citizen. Gutierrez, 22 Wn. App. 2d at 818. When asked if not knowing citizenship status would impact his ability to be fair to the defendant, the juror responded, "[i]f he's not a U.S. citizen he's already guilty. He shouldn't be here." Gutierrez, 22 Wn. App. 2d at 818. Defense counsel did not move to strike the juror for cause or exercise a peremptory challenge to remove the juror and he was seated on the jury. Gutierrez, 22 Wn. App. 2d at 818. On appeal, the appellate court held that these comments expressed actual bias by presuming that Hispanic or Latinx defendants were not citizens and were most likely committing an immigration crime and the trial court abused its discretion by failing to inquire more. Gutierrez, 22 Wn. App. 2d at 818-19.

During group questioning, Kovalenko's defense counsel asked if any of the jurors had thoughts or feelings about the use of interpreters. Juror 21 responded, "I have lived in other countries and learned their language, and, . . . I feel more respect towards someone who makes an effort. It sounds like he has been here a long time." Juror 9 raised her hand in response and said, "I thought the same thing, how long, how long do you have to be here before you learn the general language to just live the life here pretty much."

Juror 22 responded, "I think regardless of how well he speaks English, if it's not his first language he has a right to an interpreter if he thinks he will understand the

proceedings better with an interpreter." Defense counsel responded "[so] you all can't see yourselves but I'm getting nods on the 21 and 9, you should learn the language you have been here, and I'm getting also nods on 16 and 22 from different parts of the room." Several other jurors responded. Defense counsel then asked if the jurors had feelings about Kovalenko specifically requiring Russian language interpretation. One prospective juror responded, "I don't have any feelings. I just think if somebody is in a country they should know the language." Defense counsel did not move to strike either juror 21 or 9 and switched to a separate topic afterward.[6]

While the juror in Gutierrez expressed actual bias against the defendant based on presumptions about nationality and citizenship status, juror 9 did not. Juror 9 did not ask about or express an opinion on Kovalenko's nationality or immigration status. And she did not presume that Kovalenko was committing an immigration crime. Juror 9 did, however, express an opinion about individuals who do not speak English and live in the United States. At most, juror 9 demonstrated a mere possibility of prejudice. State v. Noltie, 116 Wn.2d 831, 840, 809 P.2d 190 (1991).

We conclude that the trial court did not abuse its discretion in failing to sua sponte dismiss juror 9.

III

Kovalenko argues that the trial court violated his right to confront witnesses and participate in his own trial under the Sixth Amendment, his right to testify under the Fifth

---

[6] Defense later used a peremptory challenge to remove juror 21.

Amendment, and his statutory right to an interpreter when portions of the trial were not interpreted. We disagree.

In Washington, "'the right of a defendant in a criminal case to have an interpreter is based upon the Sixth Amendment constitutional right to confront witnesses and the right inherent in a fair trial to be present at one's own trial.'" State v. Ramirez-Dominguez, 140 Wn. App. 233, 243, 165 P.3d 391 (2007) (quoting State v. Gonzales-Morales, 138 Wn.2d 374, 379, 979 P.2d (1999)). The legislature has also recognized this right and declared it to be a public policy "to secure the rights, constitutional or otherwise, of persons who, because of a non-English-speaking cultural background, are unable to readily understand or communicate in the English language, and who consequently cannot be fully protected in legal proceedings unless qualified interpreters are available to assist them." RCW 2.43.010.

As "'long as the defendant's ability to understand the proceedings and communicate with counsel is unimpaired, the appropriate use of interpreters in the courtroom is a matter within the discretion of the [trial] court.'" Gonzales-Morales, 138 Wn.2d at 382 (quoting United States v. Lim, 794 F.2d 469 (9th Cir. 1986)).

Starting with voir dire, Kovalenko was provided with two Russian interpreters. Even so, Kovalenko challenges two reenactments of testimony that occurred: the reenactments of E.K.'s prerecorded testimony and Kovalenko's direct testimony.

Before E.K.'s testimony was played for the jury, defense counsel told the trial court, "I believe it would be appropriate for the court to let the jury know that [the testimony] was translated at real time so the translators are not going to translate it

-12-

again." Based on defense counsel's request, the trial court so informed the jury.[7] And when the testimony was reenacted with an "actor" reading E.K.'s responses from the transcript, defense counsel made the same request and the trial court notified the jury.[8]

Similarly, before Kovalenko's direct testimony was reenacted, the trial court said, "the interpreters will not need to interpret this at this time since it has been interpreted once." Defense counsel did not object and the trial judge notified the jury.

Kovalenko argues that he had a right to have all the proceedings interpreted live. The State responds that Kovalenko waived these claims by failing to raise them below. We agree with the State.

For a confrontation clause challenge, a defendant must raise an objection at trial or waive the right of confrontation. State v. Burns, 193 Wn.2d 190, 210-11, 438 P.3d 1183 (2019). Relying on In re Personal Restraint of Khan, 184 Wn.2d 679, 690, 363 P.3d 577 (2015) (plurality opinion), Kovalenko responds that an attorney cannot waive a defendant's right to an interpreter. Kovalenko contends that the interpreter could not be withdrawn absent a knowing, intelligent, and voluntary waiver from Kovalenko on the record.

Kovalenko's reliance on Khan is misplaced. Khan was never provided an interpreter and on appeal argued that counsel was ineffective for failing to obtain an interpreter for him. Khan, 184 Wn.2d at 688. The Supreme Court remanded for a

---

[7] The trial court informed the jury: "I would just reflect for the jurors that during the course of this video testimony, the interpreters are not going to be continuously interpreting because when this particular hearing took place, that was already done. Obviously, they will stand ready to interpret if something happens in the course of this presentation."

[8] The trial court informed the jury, "[o]ne thing I want you to know is that because this testimony has already been translated for Mr. Kovalenko once, the interpreters are not going to be translating for this particular session."

reference hearing on whether Khan's English fluency at the time of trial demanded an interpreter and, if so, his counsel was ineffective for failing to provide one. Khan, 184 Wn.2d at 694. The Khan court also concluded that the State's argument that the decision not to obtain an interpreter may have been a strategic trial tactic was unpersuasive. 184 Wn.2d at 690.

Kovalenko has not asserted that counsel was ineffective for failing to obtain an interpreter, and Kovalenko was provided with interpreters throughout trial. The record is clear that Kovalenko's counsel was concerned with the effect of replaying E.K.'s testimony for the jury. The agreed upon solution of having an actor read her testimony into the record absolved those concerns.

There was no reason for the trial judge to sua sponte disagree with defense counsel and insist that the reenactments be reinterpreted. See State v. Woo Won Choi, 55 Wn. App. 895, 902, 781 P.2d 505 (1989) ("we find no error in the court's relying on counsel's representation in concluding that Choi did not need an interpreter"). Further, because the interpreters were interpreting everything else that occurred during trial, defense counsel's statements to the court that the testimony did not need to be reinterpreted were interpreted for Kovalenko. Kovalenko did not object, ask to confer with counsel, or in any way notify the court that he wanted those portions reinterpreted.[9]

We conclude that Kovalenko waived any challenge to use of the interpreters at trial.

---

[9] The record abounds in evidence that the trial judge was monitoring Kovalenko's interpretation needs. For instance, the trial judge interrupted the direct examination of Kovalenko's wife saying, "[j]ust a moment. Mr. Kovalenko is indicating—is he unable to hear?" And the trial judge repeatedly asked for parties to speak slowly and clearly to aid the interpreters.

IV

Kovalenko argues the trial court improperly commented on the evidence when it instructed the jury that the testimony of the alleged victims need not be corroborated. We disagree.

Article IV, section 16 of the Washington Constitution provides that "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." This constitutional provision prohibits a judge "from 'conveying to the jury his or her personal attitudes toward the merits of the case' or instructing a jury that 'matters of fact have been established as a matter of law.'" State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006) (quoting State v. Becker, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997)).

We apply a two-step analysis to determine whether a judicial comment requires reversal of a conviction. Levy, 156 Wn.2d at 723. First, we examine the facts and circumstances of the case to determine whether a court's conduct or remark rises to a comment on the evidence. State v. Sivins, 138 Wn. App. 52, 58, 155 P.3d 982 (2007). If we conclude the court made an improper comment on the evidence, we presume the comment is prejudicial, "and the burden is on the State to show that the defendant was not prejudiced, unless the record affirmatively shows that no prejudice could have resulted." Levy, 156 Wn.2d at 723.

The trial court instructed the jury that "to convict a person of rape of a child or child molestation, it shall not be necessary that the testimony of the alleged victims be corroborated. The jury is to decide all questions of witness credibility."

This instruction accurately reflects Washington law, which states that "it shall not be necessary that the testimony of the alleged victim be corroborated" in order to convict a defendant of a sex offense. RCW 9A.44.020(1). A jury instruction that does no more than accurately state the law pertaining to an issue does not constitute an impermissible comment on the evidence by the trial judge. State v. Brush, 183 Wn.2d 550, 557, 353 P.3d 213 (2015) (citing State v. Woods, 143 Wn.2d 561, 591, 23 P.3d 1046 (2001)).

Washington courts have repeatedly held that no-corroboration jury instructions do not constitute a comment on the evidence. Our Supreme Court addressed this issue in State v. Clayton, 32 Wn.2d 571, 202 P.2d 922 (1949). There, the court held that it was not a judicial comment on the evidence to instruct the jury that:

> You are instructed that it is the law of this State that a person charged with attempting to carnally know a female child under the age of eighteen years may be convicted upon the uncorroborated testimony of the prosecutrix alone. That is, the question is distinctly one for the jury, and if you believe from the evidence and are satisfied beyond a reasonable doubt as to the guilt of the defendant, you will return a verdict of guilty, notwithstanding that there be no direct corroboration of her testimony as to the commission of the act.

Clayton, 32 Wn.2d at 572; see State v. Malone, 20 Wn. App. 712, 714-15, 582 P.2d 883 (1978) (concluding a no-corroboration instruction was not a comment on the evidence).

In State v. Zimmerman, 130 Wn. App. 170, 121 P.3d 1216 (2005), Division Two of this court addressed the same issue. The court noted that the no-corroboration instruction is not included within the Washington Pattern Criminal Jury Instructions and the Washington Supreme Court Committee on Jury Instructions recommends against using the instruction. Zimmerman, 130 Wn. App. at 182. The court, though, concluded

"[a]lthough we share the Committee's misgivings, we are bound by Clayton to hold that the giving of such an instruction is not reversible error." Zimmerman, 130 Wn. App. at 182-83.

While we agree with Zimmerman that a better practice would be to not use a no-corroboration instruction, we are still bound by Clayton to hold that this no-corroboration instruction is constitutional.

V

Kovalenko contends that his right to freedom of religion under article I, section 11 of our state constitution, his right to an impartial jury under article I, section 22 and the Sixth Amendment, and his right to due process under the Fourteenth Amendment were violated when the prosecutor raised his religious beliefs throughout trial and closing arguments. We disagree.

To prevail on a claim of prosecutorial misconduct, the defendant must establish "'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (quoting State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). Any allegedly improper statements should be viewed within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions. State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997).

When there is a failure to object to improper statements, it constitutes a waiver unless the statement is "so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the

jury." Brown, 132 Wn.2d at 561. If the prejudice could have been cured by a jury instruction, but the defense did not request one, reversal is not required. State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994).[10]

"Our state constitution does not prohibit all questions pertaining to one's religion." In re Pers. Restraint of Lui, 188 Wn.2d 525, 563, 397 P.3d 90 (2017); see also State v. Dhaliwal, 150 Wn.2d 559, 579-80, 79 P.3d 432 (2003) (permissible for prosecutor in an assault case to question witness about the importance of respect in Sikh culture to establish a possible motive for that assault). It guarantees only that no person "shall . . . be incompetent as a witness or juror, in consequence of his opinion on matters of religion, nor be questioned in any court of justice teaching his religious belief to affect the weight of his testimony." WASH. CONST. art. I, § 11.

A

Kovalenko asserts that the prosecutor committed misconduct by focusing on his religion. And that the prosecutor sought to attack Kovalenko and inflame the passions of the jury by portraying him as a religious radical. We disagree.

During direct examination of Kovalenko's wife, the prosecutor asked whether the family was religious. After Ms. Kovalenko responded that they were "believers," the

---

[10] Kovalenko asks this court to apply the heightened test outlined in State v. Monday, 171 Wn.2d 667, 257 P.3d 551 (2011). In Monday, the Supreme Court held that "when a prosecutor flagrantly or apparently intentionally appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence," the conviction will be vacated unless it appears beyond a reasonable doubt that the misconduct did not affect the jury's verdict. Monday, 171 Wn.2d at 680 (emphasis added). "[A]fter Monday, prosecutorial misconduct claims involving racial bias are controlled by the 'flagrant or apparently intentional' standard.'" State v. Bagby, 200 Wn.2d 777, 789-90, 522 P.3d 982 (2023) (citing Monday, 171 Wn.2d at 680). Kovalenko's claim does not involve racial bias, thus, the heightened test in Monday does not apply.

prosecutor followed up by asking "what religion do you practice?" Without objection, Ms. Kovalenko responded "Pentecostal."

This prosecutor's inquiry was error; questioning the family's religion, and particularly what religion, was both irrelevant and unnecessary. The State relied on the Kovalenko's religion to support its argument that the strict and isolating lifestyle explained why the girls did not expose the abuse earlier. But the State concedes that it was unnecessary to inquire into the family's religion, explaining that its "argument would have been the same if the origin of the strict rules would not have been based on Kovalenko's religion."

The Defense's lack of objection was not surprising: Kovalenko's theory of the case was that his daughters fabricated the claims against him because of his rules and how strict he was in the home. When he testified about his rules he explained, "I didn't cho[o]se that model. And I wouldn't even call it Russian model. Because it's the Bible teaches us so. And the Bible tells us how the same should dress."

Viewed within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions, we conclude that the inquiry, while improper, was not so flagrant and ill-intentioned that it caused "an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury." Brown, 132 Wn.2d at 561.

B

Kovalenko next asserts that the prosecutor appealed to divine authority and religious principles in closing argument. We disagree.

In closing argument, "counsel are permitted latitude to argue the facts in evidence and reasonable inferences." State v. Smith, 104 Wn.2d 497, 510, 707 P.2d 1306 (1985); see also State v. Harvey, 34 Wn. App. 737, 739, 664 P.2d 1281 (1983). They may not, however, make prejudicial statements that are not sustained by the record. State v. Rose, 62 Wn.2d 309, 312, 382 P.2d 513 (1963).

Kovalenko points to these statements the prosecutor gave in closing argument:

> This case is also about isolation. The girls were raised in a home of isolation. They were taught to talk to only their parents or to God. [L.K.] wasn't being protected by anyone that was around her and she was not being protected by God. She had to find someone outside the home to help her and her last resort was reporting to the police. This went against every rule that she was trying to follow. At this point, she was desperate. The defendant's words, [L.K.] was not getting help from God so she looked for help from the other side. These words were chilling. Chilling to hear. They were chilling because it was true. Kind of sad.

"Help will come from somewhere else. The defendant told you that [L.K.] said this when she was confronting him with abuse. Help did come from somewhere else. It was in the form of Kevin Bowhay and Ken Gates."[11]

Kovalenko asserts that no curative instruction could have remedied the statements made by the prosecutor in closing and in support cites State v. Belgarde, 110 Wn.2d 504, 755 P.2d 174 (1998). In Belgarde, our Supreme Court held that a prosecutor's comments could not have been neutralized by a curative instruction, even if there had been an objection at trial. 110 Wn.2d at 507-08. The prosecutor described members of the American Indian Movement as "a deadly group of madmen," "militant,"

---

[11] Gates is a detective with the Whatcom County Sheriff's Office who assisted Detective Bowhay with the investigation into Kovalenko.

and "butchers, that killed indiscriminately Whites and their own." Belgrade, 110 Wn.2d at 506-07.

Kovalenko also cites Sandoval v. Calderon, 241 F.3d 765, 775, 780 (9th Cir. 2000), and State v. Ceballos, 266 Conn. 364, 383, 832 A.2d 14 (2003), overruled on other grounds by State v. Douglas C., 345 Conn. 421, 285 A.3d 1067 (2022). In Sandoval, the court reversed a death sentence because the prosecutor's closing argument invoked a passage from the New Testament of the Bible, told the jury that God sanctioned the death penalty for people like Sandoval and that by sentencing Sandoval to death, the jury would be doing what God says. 241 F.3d at 779. Defense counsel objected to the argument but the objection was overruled and no curative instruction was given. Sandoval, 241 F.3d at 779. In Ceballos, the Connecticut Supreme Court reversed a conviction because the prosecutor referenced religious characters and divine punishment in their closing argument. In both cases, the prosecutors' statements invaded the province of the jury by casting doubt upon the ultimate issue before the jury: the guilt or innocence of the defendant. Ceballos, 266 Conn. at 393; Sandoval, 241 F.3d at 779.

The prosecutor's closing argument was a direct response to Kovalenko's own testimony. Twice during direct examination, Kovalenko described L.K. confronting him about abusing her sisters. Kovalenko testified that L.K. told him, "the help will come from the other side and she got mad and left. And approximately in three or four months I was arrested." Later, Kovalenko testified that he knew L.K. instigated the accusations against him and repeated, "[s]he said help will come from somewhere else and that's where help came from, but certainly not from God."

-21-

Defense counsel did not object during the prosecutor's closing argument. Unlike in Ceballos and Sandoval, the prosecutor's statements did not invade the province of the jury. The statements were supported by the trial testimony and within the wide latitude given to attorneys during closing arguments. Smith, 104 Wn.2d at 510. The statements were nothing like the inflammatory or blatantly prejudicial statements made in Belgarde. In any event, any possibly inappropriate aspect of these comments would easily have been cured by a timely objection and curative instruction.

We conclude that the prosecutor's questioning of witnesses and closing argument do not constitute misconduct.

We affirm.

_Mann, J._

WE CONCUR:

_Coburn, J._      _Bowman, J._