# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 60347-1-II |
| Respondent, | |
| v. | |
| JAMAAR ANTONIO GRACE, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Police officers responded to Sierra Drake's home after a person called 911 to report hearing a domestic dispute over a livestream. Drake told officers that her boyfriend, Jamaar Grace, had pointed a gun at her, struck her multiple times, strangled her for several minutes, and threatened to kill her and their infant son. Drake then went to the emergency room for an examination. Police arrested Grace, and Grace called Drake from jail and asked her to recant her accusations. The State ultimately charged Grace with 2 counts of second degree assault, 2 counts of harassment, unlawful possession of a firearm, witness tampering, and 4 violations of a no-contact order.

During voir dire, a potential juror who was later empaneled told the trial court he was experiencing a recent and ongoing domestic violence situation in his home, where his teenage son assaulted the juror's wife. Partway through trial, the same juror told the court that he recognized two witnesses—a police officer and an emergency room doctor—because he had met them in the course of dealing with his son's domestic violence. The juror assured the court that he still believed

he could decide the case impartially. Neither party sought the juror's dismissal and the trial court did not excuse the juror on its own accord. The jury convicted Grace of all charges.

Grace appeals his convictions, claiming that the juror was biased, that the trial court should have dismissed the juror sua sponte, and that Grace's counsel was ineffective for failing to seek the juror's removal. Grace also raises several additional claims in a statement of additional grounds (SAG). We affirm.

## FACTS

### I. BACKGROUND

Jamaar Grace and Sierra Drake were in a romantic relationship and had an infant child together. On January 15, 2024, Kitsap 911 received a call from a person who was concerned for Drake's safety. The caller told the 911 dispatcher that he lived in Tennessee. The caller said he was on a livestream with Drake when he heard her say to someone, "I can't believe you're going to do this in front of my son, put the gun down, if you need help we'll call 911 and get you the help that you need." Ex. 1, at 46 sec. to 55 sec. The caller said that after Drake said this, he was no longer able to see or hear "what was going on on her end." Ex. 1, at 1 min., 49 sec. to 1 min., 53 sec. The caller stated that this had occurred roughly 5 to 10 minutes before he called 911.

The caller gave the dispatcher Drake's address in Bremerton, Washington. The caller told the dispatcher that he knew Drake had problems with her baby's father but "it really hasn't ever . . . escalated . . . physical[ly]." Ex. 1, at 2 min., 22 sec. to 2 min., 26 sec. The caller told the dispatcher he was "trying to call to make sure . . . we can get somebody to go by there and check on this girl . . . just to make sure that she's okay." Ex. 1, at 5 min., 37 sec. to 5 min., 46 sec.

After the 911 call, Officer Max Baumgartner and several other police officers went to Drake's home. Drake told Baumgartner that Grace had left 10 minutes previously. She explained that Grace had visited her house twice that night, and that Grace was upset because she had gone on a date with someone else.

Drake reported that Grace was angry but not violent during the first visit. But when he returned an hour later, he immediately pulled out a gun and held it to Drake's head. Drake told Baumgartner that Grace yelled at her and called her misogynistic slurs. She claimed Grace "struck [her] on the head several times," "slammed her head into a banister," dragged her down the stairs, and "strangled" her by holding his hands over her mouth and nose. 10 Verbatim Rep. of Proc. (VRP) at 754-757. Drake said that the "strangulation" lasted 10 to 20 minutes, that she could not breathe or speak, and that she lost consciousness. 10 VRP at 756. Drake stated that she kicked a hole in the wall while she struggled. Drake reported that Grace kept his gun "close to him during the duration of the assault" and at one point "held it to her abdomen." 10 VRP at 758. She also told Baumgartner that Grace threatened to kill her and their child if she called the police. The police took photographs of Drake at the scene. Emergency medical services then transported Drake to the hospital, where Dr. Wesley White evaluated her.

Police went to Grace's home. An officer looked inside Grace's vehicle from the outside and saw a black handgun. Police then arrested Grace at his home. When police removed the firearm from the car, an officer saw a red substance on the firearm that he believed could be blood and swabbed it for DNA residue. A forensic scientist at the Washington State Patrol Crime Laboratory later tested the swabs and found staining consistent with blood and strong support for Drake's DNA profile being present.

The State initially charged Grace with one count of second degree assault by strangulation or suffocation and one count of unlawful possession of a firearm. The State also issued a pretrial domestic violence no-contact order prohibiting Grace from having any contact with Drake. Shortly after the State issued the no-contact order, Grace sent Drake texts from jail on four separate occasions.

Grace also had a conversation with Drake from jail on a recorded phone call where he told her he could not remember what had happened because he was drunk. Drake said that he beat her on the staircase. Drake told Grace that she told police she did not want to press charges and that she never accused Grace by name. Grace told Drake, "please tell them it wasn't me." Ex. 29A, at 4 min., 56 to 4 min., 58 sec. Drake responded that she would "help [Grace] get out." Ex. 29A, at 5 min., 36 sec. to 5 min., 38 sec. The conversation continued in this vein for roughly 15 minutes.

The State added charges and enhancements against Grace in an amended information. The final list of charges included second degree assault by strangulation or suffocation and second degree assault with a deadly weapon based on physically attacking Drake; two counts of harassment based on threatening to kill Drake and their child; first degree unlawful possession of a firearm; tampering with a witness based on Grace's call with Drake; and four counts of violation of a court order based on Grace's texts to Drake. The State included a special allegation of domestic violence against an intimate partner to each of the charges except the unlawful possession charge. The State also included allegations of deliberate cruelty, domestic violence, and being armed with a firearm at the time of the offense as aggravating circumstances to each of the assault and harassment charges.

4

II. TRIAL

A.     Voir Dire

The case proceeded to jury trial. During voir dire, the State asked several prospective jurors whether they believed domestic violence was "still a problem in our society" and to explain why or why not. 8 VRP at 454. One prospective juror, who would later be empaneled as "Juror 7", responded:

> I think that domestic violence is still very much a problem . . . . I believe that my son . . . hit my wife on Friday night. He survived. They were like, [w]e can either arrest him and put him in juvenile detention, or do you want him to go to the hospital? And he's been in juvenile detention before and enjoyed it too much, so we went to have him go to the hospital to be evaluated. They released him about 3:00 in the morning, and he has no care about what he did to his mother at all, has not apologized. My wife and I have tried raising with Biblical standards -- love, kindness, respect -- and so far it hasn't helped. I feel very strongly about domestic violence. People need to treat each other with kindness and respect. That kind of behavior is not helpful for anybody.

8 VRP at 465.

The State then asked Juror 7 if he "would be comfortable being a juror in a case like this given" his ongoing situation at home. *Id.* Juror 7 replied that he was comfortable hearing the case, stating, "This situation is not my own family, so I believe I can keep an open mind." *Id.* The State next asked Juror 7 how he felt about the way the police had responded to the situation at his home, and whether he felt "that they tried to be helpful or are more trouble than helpful." 8 VRP at 466. Juror 7 replied:

> The police have been very respectful, very helpful. Trying to decide (inaudible) basis, Oh, they've been here before. Their hands are kind of tied. They don't have a whole lot of options, but . . . I've had no problem with the law enforcement (inaudible).

8 VRP at 466.

Additionally, defense counsel asked whether anyone believed "that if people don't want . . . law enforcement to be involved in their personal relationships, law enforcement shouldn't get involved." 8 VRP at 471. Juror 7 responded that, assuming all the involved parties agreed, "[u]ntil it affects the neighbors or other people, then I don't think that law enforcement would need to be involved." *Id.* He agreed with the defense's suggestion that "what's acceptable in one person's relationship might be different than another's." 8 VRP at 472. Later, defense counsel asked the jury pool to volunteer how they might approach a situation where two sides are offering conflicting narratives. Juror 7 stated that "you [could] ask a question a little bit later, ask the same question but maybe worded a little differently to see if the story changes." 8 VRP at 483.

Grace did not exercise any challenges for cause. 8 VRP at 516-17. Grace exercised six peremptory challenges, which did not include Juror 7. Juror 7 was empaneled.

B.      Trial Testimony

1.      Testimony relating to the altercation

Officer Max Baumgartner testified about what Drake told him when he was dispatched to her home consistently with the facts described above. Baumgartner also testified that Drake appeared to have been crying when he arrived, and that she began crying during their conversation. He testified that he did not notice any signs that Drake was impaired. And he testified that her voice was "raspy, like something was stuck in her throat . . . preventing her from speaking normally." 10 VRP at 760. He also told the jury that her cheeks were flushed and there were scratch marks on her neck.

Dr. White testified that he treated Drake in the emergency room on the day of the incident and that she was experiencing facial pain and a headache. Dr. White further testified that Drake

6

reported her pain was caused by an "assault[] by a significant other" and that she had been "struck multiple times in the right side of her head[,] . . . pushed down a flight of stairs[,] . . . strangled[,] . . . [and] hit on her chest wall with a gun." 9 VRP at 675-76. And he testified that Drake told him she lost consciousness when she was strangled.

Dr. White read notes from other first responders and medical professionals that revealed Drake had given them a similar explanation for her injuries. He testified that he examined Drake and found tenderness in her scalp, bruising beneath her left eye and in the throat area, and tenderness around the spine in her neck and in the torso. Dr. White told the jury that manual strangulation could cause the kind of neck bruising that Drake presented with. He testified that he ultimately diagnosed Drake with "[f]acial injury, alleged assault, fall, assault by manual strangulation, [and] chest wall pain." 9 VRP at 686.

When Drake took the stand, her testimony contradicted what she told Baumgartner and White on the night she was injured. She told the jury that she and Grace got into an argument because she found out he was involved with another woman, and she ultimately attacked him. Drake testified that Grace "was trying to keep [her] at arm's length" and push her off of him while she assaulted him. 9 VRP at 594. She denied that Grace strangled her, bashed her head against the banister, or threatened to kill her or their son. She stated that Grace eventually "made it out the front door" and that police arrived shortly afterward. *Id.* At the time, there was a no-contact order in place requiring Drake to avoid contact with Grace.

When asked whether Grace was armed, Drake testified that she did not recall him having a gun with him at the time. Drake stated that she mentioned a gun while the livestream was still running because she wanted to get Grace in trouble. Drake told the jury that when she went to the

emergency room on January 15, 2024, she was not physically hurt but merely "very upset." 9 VRP at 581. She denied having a headache, sore throat, or sore neck. She claimed that the bruising on her neck occurred because she was wearing a necklace that had dug into her skin as she attacked Grace. Drake also testified that on the jail phone call between herself and Grace, which the State later played for the jury, Grace was asking Drake to tell the truth to the court.

The jury also heard testimony from officers involved with Grace's arrest relaying that they found a gun in Grace's car and swabbed it for DNA analysis. The forensic scientist who analyzed the swabs from the gun testified that the swabs had a very strong probability of containing Drake's DNA, over a 1 in 1,000,000 chance. Additionally, the trial court admitted an audio recording of the 911 call to evidence without objection, and the State played the recorded call for the jury. The 911 caller did not testify.

2.       Juror 7 raised knowledge of witnesses to the court

After Baumgartner and Dr. White testified, Juror 7 informed the court that he recognized both witnesses.

Juror 7 explained that when he had taken his son to the hospital the previous weekend to be evaluated after his son assaulted his wife, Dr. White had evaluated his son. Juror 7 stated that he talked with Dr. White for 15 to 20 minutes about his son's care. The trial court asked Juror 7 whether his interaction with Dr. White was "very positive" or "negative" and whether Juror 7 had "any opinions about [Dr. White] regarding that experience." 10 VRP at 782-83. Juror 7 responded, "He was just very thorough, just like when he was explaining . . . different things. He was just very -- he's a doctor, very specific about what he was talking about." 10 VRP at 783. The trial court

asked whether Juror 7 believed his experience with Dr. White "create[d] some unfair bias to either side in [the] case[,]" and Juror 7 said he did not. 10 VRP at 783.

Juror 7 also told the court that on one instance over a year ago, Baumgartner came to his home to respond to his son's behavior, and that he recognized Baumgartner by face but not by name. Juror 7 stated that over the past 4 years, 10 to 12 different officers had responded to his home for incidents involving his son and that some had responded multiple times. Juror 7 told the trial court that Baumgartner did not "stand out any more or less than the other" officers he had interacted with. 10 VRP at 786.

The trial court asked Juror 7 whether his contact with Baumgartner was favorable or not. Juror 7 responded, "I've never had any problems with the officers. They've always been very polite, try to keep to the facts." 10 VRP at 784. When asked about his interactions with the police in his home in general, Juror 7 stated, "They've all been very straightforward, very easy to work with, have never had any problems with any of them." 10 VRP at 785. The trial court asked Juror 7 whether he believed his interaction with Baumgartner would unfairly advantage either party in the case. Juror 7 responded, "No. I'm a person who just keeps things to the information of what happened, and I don't think it would vary one way or another, no, sir." *Id.*

The trial court then asked if either party wanted to challenge Juror 7 for cause or move to excuse him from the jury. Neither party sought to challenge or excuse Juror 7.

The jury found Grace guilty of all charges, and it found all of the special circumstances and aggravators the State had charged.[1] Grace appeals his convictions, arguing that his

---

[1] The second degree assault with a deadly weapon conviction and the harassment conviction based on Grace's threat to Drake that he would kill their child were later vacated on double jeopardy grounds.

constitutional right to a fair trial was violated because Juror 7 was biased. Grace brings several additional claims in his SAG.

ANALYSIS

I. JUROR BIAS

Grace argues that Juror 7 was biased and that the trial court abused its discretion when it failed to sua sponte dismiss him after learning that he was acquainted with Officer Baumgartner and Dr. White. The Sixth Amendment to the federal constitution and article 1, section 22 of the Washington Constitution guarantee criminal defendants the right to a fair and impartial jury. *State v. Latham*, 100 Wn.2d 59, 62-63, 667 P.2d 56 (1983). Allowing a biased juror to deliberate violates that right. *State v. Irby*, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015). "The presence of a biased juror cannot be harmless, and allowing a biased juror to serve on a jury requires a new trial without a showing of prejudice." *State v. Lawler*, 194 Wn. App. 275, 282, 374 P.3d 278 (2016).

Even after the jury has been empaneled, trial courts have "'a continuous obligation . . . to excuse any juror'" who manifests actual or implied bias. *State v. Sassen Van Elsloo*, 191 Wn.2d 798, 809, 425 P.3d 807 (2018) (quoting *State v. Jorden*, 103 Wn. App. 221, 227, 11 P.3d 866 (2000)); *see also State v. Lupastean*, 200 Wn.2d 26, 35, 513 P.3d 781 (2022) (A party may challenge a juror for cause on the basis of implied or actual bias). "We review a trial judge's failure 'to . . . excuse [a] juror sua sponte' for abuse of discretion.'" *State v. Kovalenko*, 30 Wn. App. 2d 729, 740, 546 P.3d 514 (2024) (alteration in original) (quoting *State v. Gutierrez*, 22 Wn. App. 2d 815, 822, 513 P.3d 812 (2022) (plurality opinion)). "[A] trial court should exercise caution before injecting itself into the jury selection process" because "[w]hether to keep a prospective juror . . . often is based on the trial counsel's experience, intuition, strategy, and discretion." *Lawler*, 194

Wn. App. at 284-85. "Trial counsel may have legitimate, tactical reasons not to challenge a juror" whose responses "suggest some bias." *Id.* at 285. "We afford great deference to the trial court's assessments concerning bias" because the trial court "is best positioned to . . . observe the juror's demeanor and tone, gauging the subtler tells of bias that may not be captured in the transcripts." *State v. Smith*, 3 Wn.3d 718, 720, 724, 555 P.3d 850 (2024).

A.      Actual Bias

In his SAG, Grace claims Juror 7 manifested actual bias. Actual bias exists when the trial court is satisfied that the juror's subjective state of mind about the case or parties involved prevents them from evaluating the issues impartially. RCW 4.44.170(2) (stating the Washington statutory standard for actual bias); *see also Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007) (describing the federal courts' standard for actual bias based on the Sixth Amendment similarly). Generally, courts find actual bias when the juror has made some statement indicating a bias "without a subsequent assurance of impartiality." *Smith*, 3 Wn.3d at 726; *see also Fields*, 503 F.3d at 767. Courts give "significant weight to a juror's definitive statement that [they] can serve impartially[,]" though such assurances are not dispositive. *United States v. Gonzalez*, 214 F.3d 1109, 1112 n.3 (9th Cir. 2000). We review actual bias for abuse of discretion. *Ottis v. Stevenson-Carson Sch. Dist. No. 303*, 61 Wn. App. 747, 755-56, 812 P.2d 133 (1991).

Juror 7 repeatedly assured the trial court that he could hear the case impartially in spite of his personal experiences and acquaintance with Baumgartner and Dr. White. The trial court apparently found these assurances to be credible. Grace has not provided any evidence that Juror 7's assurances were untrue. Grace has not shown that Juror 7 displayed any actual bias, nor has he shown that the trial court abused its discretion when it did not find actual bias.

B.      Implied Bias

Grace also claims that Juror 7 demonstrated implied bias. Separate doctrines of implied bias exist under Washington and federal law. *See Lupastean*, 200 Wn.2d at 56 ("[I]mplied bias is not limited to 'the strict language of the [Washington] implied bias statute' because there is a 'Sixth Amendment doctrine of implied bias,' which exists entirely apart from the statute." (quoting record; quoting *State v. Boiko*, 138 Wn. App. 256, 260-61, 156 P.3d 934 (2007)). Implied bias exists under Washington statute when the court ascertains facts "in judgment of law [that] disqualif[y] the juror." RCW 4.44.170(1). The legislature has further clarified that statutory implied bias exists only under four specific circumstances, including where the juror has "[i]nterest . . . in the event of the action, or the principal question involved therein." RCW 4.44.180(4).[2] Grace does not meaningfully argue that implied bias is satisfied under Washington statute.

The Sixth Amendment to the United States Constitution also guarantees an impartial jury. U.S. CONST. amend. VI. Washington courts have recognized that a dismissal of a juror under the Sixth Amendment should occur only in "exceptional cases" where the trial court has determined that the facts demonstrate the juror could not be unbiased. *State v. Cho*, 108 Wn. App. 315, 325, 30 P.3d 496 (2001). Washington courts have generally found implied bias where a juror fails to disclose material information to improve their chances of being empaneled. *See id*; *see also Lantz v. State*, 28 Wn. App. 2d 308, 327, 535 P.3d 501 (2023).

---

[2] The other three circumstances clearly do not apply here: when the juror has "[c]onsanguinity or affinity within the fourth degree to either party"; has a legal relationship such as landlord-tenant or attorney-client, or a familial relationship; or has "served as a juror on a previous trial in the same action, or in another action between the same parties." RCW 4.44.180(1)-(3).

But a juror's close relationship to trial participants may also give rise to an inference of implied bias in some cases. For instance, Division Three of this court held that the trial court did not abuse its discretion when it granted a new trial based on a juror's relationships to the prosecutor and a key witness for the State. *Boiko*, 138 Wn. App. at 258. Although the juror told the trial court at voir dire that she knew the prosecutor and the witness, she was not asked—and did not volunteer—how she knew them. *Id.* at 259. The juror did not indicate that her knowledge of the prosecutor and witness would affect her ability to be impartial. *Id.* The defendant was convicted, and defense counsel moved for a new trial after learning that the juror was married to the witness and knew the prosecutor because they were set to be her opposing counsel in an upcoming civil case. *Id.* The trial court granted the motion. *Id.* at 260. Division Three did not disturb the trial court's ruling, reasoning that "the peculiarities arising in this situation were numerous, complex, and fairly considered by the trial court implying bias and ordering a new trial." *Id.* at 264.

Federal courts have also found implied bias in certain cases where "a prospective juror has a relationship to the crime itself or to someone involved in a trial." *Fields*, 503 F.3d at 766. Under persuasive Ninth Circuit case law, a juror may be impliedly biased when their personal history or circumstances closely track the facts of the case in a way that would create "substantial emotional involvement" in an average person. *See United States v. Allsup*, 566 F.2d 68, 71-72 (9th Cir. 1977) (finding jurors who were employees of a branch of the bank that was robbed in the case before them were impliedly biased despite disclosing their employment); *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979) (ruling that juror who failed to disclose his two sons' long incarceration for heroin-related crimes was impliedly biased in a heroin conspiracy case); *Gonzalez*, 214 F.3d at 1114 (holding that juror in a drug conspiracy case who disclosed that her

marriage had collapsed due to her husband's cocaine use and repeatedly equivocated when asked if she could remain impartial was impliedly biased). But it is unlikely to be enough that a juror merely has a personal history with the crime in question. *See Fields*, 503 F.3d at 774 (explaining that "[b]eing the spouse of a rape victim is not, in and of itself, such an 'extreme' or 'extraordinary' situation that it should automatically disqualify one from serving on a jury" in a rape case). Typically, the Ninth Circuit has not found implied bias on that basis without something more, such as the juror concealing their history or refusing to tell the court they could put their experiences aside and deliberate impartially. *See Eubanks*, 591 F.2d at 517; *Gonzalez*, 214 F.3d at 1114.

1.      Sua sponte dismissal

Grace does not argue that Juror 7's circumstances fall into one of the statutory categories of implied bias outlined in RCW 4.44.180. Instead, Grace seems to rely on the Sixth Amendment, arguing that Juror 7's personal experiences with domestic violence, paired with his familiarity with Officer Baumgartner and Dr. White, "represent the kind of influence that would prejudice an average person." Opening Br. of Appellant at 16.

We acknowledge that Juror 7's ongoing experiences with domestic violence in his home could potentially make him more emotionally affected by the facts of this case than the average juror. Juror 7's comments indicate he was troubled by his son's history of violence against family members. He told the court that he thought domestic violence was a problem; that he has sought to raise his son with "love, kindness, [and] respect" but that "it hasn't helped"; that he opted to send his son to the hospital instead of juvenile detention because his son has "been in juvenile detention before and enjoyed it too much"; and that his son "has no care about what he did to his mother at all." 8 VRP at 465.

Additionally, Juror 7 met Baumgartner and Dr. White in the course of his own experiences with domestic violence and had positive things to say about their professionalism and dealings with him. While personal experience with crimes similar to those being tried does not, on its own, generally evince implied bias, Juror 7's knowledge of these witnesses and respect for them professionally is an additional factor that could cause a person to be more sympathetic to the State's arguments.

Nevertheless, the circumstances here do not show that the trial court abused its discretion. Notably, Juror 7 disclosed his recent experiences with domestic violence at voir dire, and he voluntarily told the trial court about his interactions with Baumgartner and Dr. White after he recognized them. That disclosure differentiates this case from the majority of cases where Washington courts have found implied bias in the past. Additionally, Juror 7 never indicated that he would have trouble remaining unbiased in the case. To the contrary, he repeatedly assured the trial court that he could hear the case in an impartial manner in spite of his personal experiences and his familiarity with Baumgartner and Dr. White. This case is therefore different than *Gonzalez*, where the juror in question would not say that she could be impartial.

Further, Juror 7's contacts with Baumgartner and Dr. White were relatively minimal. Juror 7 reported that Baumgartner was one of 10 or 12 officers that had responded to his home over the course of 4 years; that unlike other officers, Baumgartner had only come once; and that he only recognized Baumgartner by his face and not his name, suggesting the two did not interact extensively. Juror 7 also stated that he spoke to Dr. White for only 15 to 20 minutes. And the assessment focused on his son's health rather than injuries caused by family violence, which was the subject of White's testimony in this case. Even though these interactions seem to have been

generally positive, it is unlikely that an average juror's decision-making would be greatly affected by them because they were so brief. This situation is therefore unlike *Boiko*, where the juror in question was married to one of the witnesses and had a professional relationship with the prosecutor.

Importantly, the trial court was in the best position to observe Juror 7's demeanor and tone when he was answering questions. The trial court apparently found Juror 7's assurances that he could remain unbiased to be credible. Neither counsel chose to challenge Juror 7 or seek his dismissal, suggesting counsel also believed Juror 7's assurances were credible. Without evidence contradicting Juror 7's assurances, we defer to the trial court's ability to observe Juror 7 as he was questioned.

Finally, the trial court was likely reluctant to interfere with defense counsel's strategy by dismissing Juror 7 sua sponte. While Juror 7 clearly expressed that he believed domestic violence was a problem, defense counsel may have believed that Juror 7's relationship to his son would make him more likely to appreciate nuance in a domestic violence case. Additionally, Juror 7's answer to defense counsel's voir dire questioning about how to assess conflicting narratives might have signaled to Grace that Juror 7 would be skeptical of Drake's original recounting of events, since her story later changed. The trial court explicitly offered trial counsel an opportunity to move to excuse Juror 7 after his acquaintance with witnesses became known. Defense counsel's decision not to do so when prompted may have further suggested to the trial court that defense counsel had "legitimate, tactical reasons not to challenge" Juror 7. *Lawler*, 194 Wn. App. at 285.

We conclude that the trial court did not abuse its discretion when it declined to find "exceptional circumstances" indicating that Juror 7 was impliedly biased and excuse Juror 7 sua sponte on that basis. *Fields*, 503 F.3d at 766.

2.     <u>Ineffective assistance of counsel</u>

Grace also argues that his counsel was ineffective for failing to seek dismissal of Juror 7. The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution "guarantee[] the right to effective assistance of counsel" to all criminal defendants. *In re Pers. Restraint of Davis,* 152 Wn.2d 647, 672, 101 P.3d 1 (2004).

To succeed on an ineffective assistance claim, the petitioner must show that "counsel's representation was deficient" and that "counsel's deficient representation prejudiced the defendant." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Representation is deficient if it falls "below an objective standard of reasonableness based on consideration of all the circumstances." *Id.* Because we presume counsel was effective, "the defendant must show in the record the absence of legitimate strategic . . . reasons" for counsel's conduct. *Id.* at 336. For the same reasons described above, and especially because Grace has not shown that trial counsel lacked strategic reasons to keep Juror 7 empaneled, we also hold that counsel was not deficient and therefore counsel was not ineffective.

## II. SAG Arguments

A.     <u>Sufficiency of Evidence</u>

In his SAG, Grace argues that there was "[i]nsufficient evidence to convict of firearm," presumably referring either to his firearm possession charge or to the firearm enhancements attached to his assault and harassment charges, or both. SAG at 2.

When assessing whether sufficient evidence supports a conviction, we ask "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019) (internal quotation marks omitted) (quoting *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (plurality opinion)). We assume all the State's evidence is true and draw "'all reasonable inferences'" in the State's favor. *Id.* (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)).

Baumgartner testified that Drake told him Grace had a firearm throughout the entire altercation. Another officer testified that he found a handgun in Grace's car when police went to arrest Grace. The handgun had blood on it that DNA evidence tied to Drake. Additionally, Dr. White testified that Drake told him that her significant other struck her on the chest with a gun. And in the 911 call admitted into evidence, the caller told the dispatcher that Drake said, "Put the gun down" when the altercation began. Ex. 1, at 49 sec. This evidence was enough for a rational jury to conclude that Grace possessed a firearm and had it with him during the commission of the assault and harassment crimes. We hold that there was sufficient evidence for Grace's possession of a firearm charge and the firearm enhancements.

B.      Prosecutorial Misconduct and *Brady v. Maryland* Violation

Grace argues that the prosecutor improperly withheld exculpatory evidence showing that Grace did not possess a firearm during the commission of the crime, in violation of *Brady v. Maryland*.[3] Grace explains that "tests will show fingerprints and DNA on [the] firearm," proving that he "did not attempt to wipe [the] firearm clean." SAG at 3. Grace points to nothing in this

---

[3] 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

record that suggests the State withheld DNA test results or any other evidence. We therefore cannot consider these arguments. *See McFarland*, 127 Wn.2d at 335 ("Where . . . the claim is brought on direct appeal, the reviewing court will not consider matters outside the trial record.").

C.      Admission of 911 Call

Finally, Grace argues that the trial court violated his right to confront witnesses when it allowed the 911 call to be admitted into evidence even though the caller did not testify at trial. SAG at 2-3. He also argues that his trial counsel was ineffective for failing to object to the call's admission. *Id.*

Under the Sixth Amendment, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against [them]." U.S. CONST. amend. VI. The confrontation clause "bars 'admission of testimonial statements of a witness who did not appear at trial unless [they] [were] unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (quoting *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)).

Courts evaluate the primary purpose of a statement to determine if it is testimonial and therefore implicates the confrontation clause. *Smith v. Arizona*, 602 U.S. 779, 800-01, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024). In the context of law enforcement questioning, a statement is testimonial "when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. By contrast, a statement is nontestimonial when "circumstances objectively indicat[e] that the primary purpose . . . is to enable police assistance to

meet an ongoing emergency." *Id.* It is possible for some statements in an interrogation to be testimonial while others are not, and "a conversation [that] begins as an interrogation to determine the need for emergency assistance can[] . . . 'evolve into testimonial statements,' once that purpose has been achieved." *Id.* at 828 (citation omitted) (quoting *Hammon v. State*, 829 N. E. 2d 444, 457 (Ind. 2005)).

Because the primary purpose test is an objective one, "the relevant inquiry is not the subjective or actual purpose of the individuals involved . . . , but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances" of the encounter. *Michigan v. Bryant*, 562 U.S. 344, 360, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). "A 911 call, . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Davis*, 547 U.S. at 827 (alterations in original).

The caller's statement that he was "trying to call to make sure . . . we can get somebody to go by there and check on" Drake when he called 911 reveals his subjective mindset rather than the objective purpose of the call and is therefore not the focus of our analysis. Ex. 1, at 5 min., 37 sec to 5 min., 46 sec. But other facts surrounding the call support the conclusion that a reasonable caller in the same situation would have had the same purpose.

The caller reported to the dispatcher that he heard Drake tell someone to "Put the gun down" and that Drake then disappeared from the livestream. Ex. 1, at 49 sec. A reasonable person hearing that comment would believe that Drake was in danger from an assailant. The caller made the call to 911 shortly after hearing Drake's comments to Grace on the livestream—within 5 or 10

20

minutes. And because the caller was from out of state, it may have taken him a few minutes after Drake left the stream to determine the correct number to call for emergency help in Kitsap County, Washington; the first thing he did on the call was confirm with the dispatcher that he had called the correct number. Thus, the caller seems to have called as soon as was reasonably possible, when the potential danger to Drake was still ongoing. These facts support a conclusion that the primary purpose of the call was to secure emergency help for Drake.

It is possible for some statements made in a 911 call to be testimonial even if others are not. But Grace does not identify any particular statements in the call he objects to, and none are obviously problematic. The caller noted that Drake's baby's father might be the potential assailant but did not name him. And even if he had done so, such an identification is not necessarily testimonial in the context of a 911 call. *Davis*, 547 U.S. at 827 (911 caller's statements about her assailant's identity during an ongoing emergency were nontestimonial because the information would help responding officers understand whether they would be encountering someone with a history of violence).

We therefore hold that the 911 call was nontestimonial and that its admission did not violate Grace's confrontation rights. And because the call's admission was proper, we also hold that trial counsel was not ineffective when he did not object.

CONCLUSION

We affirm the trial court.

21

No. 60347-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

CRUSER, J.

PRICE, A.C.J.